## PICKETT V. FERGUSON, ET AL.

1. INNOCENT PURCHASER: *Purchase of lease pendente lite.*
   One who takes a lease of land, during the pendency of a suit to foreclose a mortgage upon it, takes with constructive notice of the pendency and status of the litigation.

2. CHANCERY JURISDICTION: *To restrain suits in another state.*
   A court of equity has power to restrain a party within its jurisdiction from prosecuting a suit in the courts of another state.

3. SAME: *Refusing to hear party in contempt.*
   A court of equity may refuse to hear a party who is in contempt for disobeying its orders. BY THE COURT: But this rule applies only to matters of favor. A party in contempt will he heard on matters of strict right.—EAKIN, J.

4. PRACTICE IN SUPREME COURT: *Remanding chancery causes for further proof, etc.*
   The supreme court will not remand chancery causes for further proceedings and proofs when it can plainly see from the record what the rights and equities of the parties are; but will render such decree as ought to have been rendered below.

5. JUDGMENTS AND DECREES: *Defendants not summoned.*
   A judgment or decree of a court of another state than that of the defendant's residence, in a suit in which he did not appear nor was personally served with summons, is a nullity, although he was a member of a partnership which was sued and which was situated in the state of the forum.

6. CHANCERY PRACTICE: *Dismissal after cross-complaint filed.*
   A plaintiff cannot dismiss his complaint in equity without prejudice, after a cross-complaint has been filed against him.

II——45

7. LANDLORD AND TENANT: *Tenant's purchase of landlord's title.*

A tenant cannot extinguish his landlord's title to the demised premises by purchasing a title adverse to his landlord, but he may do so and terminate the lease by purchasing his landlord's title at a voluntary or forced sale.

8. EVIDENCE: *Parol, to enlarge written contract.*

Parol evidence that a lessee for years agreed to give notes *in presenti* for the rents of succeeding years is inadmissible where the lease is reduced to writing and contains no such agreement, and there is no averment that owing to fraud, accident or mistake, the writing does not fully express the concurrent intention of the parties.

9. LANDLORD AND TENANT: *Withholding rent to meet damages from apprehended eviction.*

A tenant cannot withhold over-due rents or other moneys due the landlord to cover damages from an apprehended eviction by a superior title.

10. SAME: *Covenant for quiet enjoyment implied.*

The covenant for quiet enjoyment is implied in every mutual contract for leasing land.

APPEAL from *Mississippi* Circuit Court in Chancery. Hon. J G. FRIERSON, Circuit Judge.

*Metcalfe & Walker*, of Tennessee, for Appellant.

1. The final judgment in the contempt proceedings, and in refusing to allow plaintiff to plead to the cross-bill were appealable, and reviewable after final decree. *22 Ark., 499; 11 Humph., 389; 5 Heisk., 244; 5 Humph., 25.*

2. The judgment in the contempt proceedings was erroneous, because: 1st. The penalty adjudged and enforced was expressly forbidden by statute. *Gantt's Digest,* Sec. 822; *44 Wis., 411.* The rule only extends to matter of favor. *1 Paige, 466; 4 Sandf. Chy., 366; 47 N. Y., 49.* 2d. No injunction bond was filed or required. *Gantt's Dig., Sec. 3459; 101 U. S., 301; 4 Paige, 444.* 3d. The circuit court had no power to award the injunction, and it was a nullity. *2 Paige, 402; 8 Id., 440; 2 Barb. Chy. 280; 4 Edw. Chy., 364; 2 Dev. Eq.,*

*195; 4 Cr., 179; 7 Id., 278; 21 How., 516; 6 Wall., 166; 7 How., 612; 49 Ill., 90; 2 Dan. Ch. Pl. & Pr., 1627; High on Inj., 57, et seq.; 4 Allen, 550; 28 Vt., 470.* 4th. No state has power to send its process for service into the limits of another state. *5 Paige, 299; 57 Miss., 445.* The circuit court had no jurisdiction *in personam* of plaintiff. The bill filed by her was auxiliary to the Tennessee suit, and could not be taken as a voluntary submission of herself to the power of the court, under a cross-bill the sole purpose of which was to stay proceedings in Tennessee.

3. The evicted tenant can only recover such rent as he has paid *in advance*. Beyond that the only effect is to *stop future rents. Taylor's Land. & T., Sec. 317, and note.* Nor can the evicted tenant recover for improvements, except such as he expressly stipulates to make by the lease contract. *Ib.*

4. The announcement by Hays Pickett, at the sale, that the purchaser would get the lease, was but the announcement of a legal proposition. *69 Penn. St., 316; 19 Wall., 544; Taylor's Land. & Ten., Secs. 439, 442; 75 N. C., 458.*

5. The testimony shows that Hanauer bought for Ferguson & Hampson; that F. & H. were the real purchasers; and being in possession as the tenants of plaintiff at the time of the sale, she is entitled to redeem. *Story Eq. Jur., Sec. 323; Perry on Trusts, Secs. 206 to 210; 6 Lea, 627; 10 Nebraska, 102; 9 Paige, 237; 2 Black, 613; 101 U. S., 501; 12 Pet., 295; 4 How., 503; Meigs, 181; 28 Miss., 677; 42 Iowa, 665; 13 B. Mon., 511; 98 Ill., 200; Rawle on Cov. (4th Ed.), 172; 1 Lead. Cas. in Eq., 94; Taylor Land. & T., Secs. 341–395; 33 Ark., 195; 38 Id., 18; 33 Id., 575; 3 Watts & S., 486; 2 Smith's Lead. Cas., 681.*

6. By violating their agreement to give their notes for rent, and withholding the insurance money and rent due, F. & H. brought on the sale, which could have been averted if they had acted in good faith.

7. Parol proof competent to show the agreement to give the rent notes. *11 Humph., 308; 5 Cold., 539; 1 Head., 231; 9 Lea, 104; 2 Sneed, 439.* This was a case where only part of the parol contract was reduced to writing, and the evidence was competent. *1 Greenl. Ev., Sec. 284 a; 11 Humph., 307; 5 Cold., 539.*

8. Plaintiff not guilty of laches. Laches only commence from the discovery of fraud.

9. If appellees had paid the amount due, plaintiff could have purchased at the sale.

10. The decree of the Tennessee court is final and conclusive of the right to redeem, and of all other questions adjudicated there, and is binding upon the courts of Arkansas. *1 Head., 240; 1 Heisk, 536; Sec. 1, Art. 4, Const. U. S.*

*U. M. & G. B. Rose* for Appellees.

The title to lands can only be settled according to the laws of the state in which they lie. *Wharton Conf. Laws, Sec. 273; 9 Wall., 23; 27 Ark., 482.*

There is no precedent for an *auxiliary* bill in aid of a former suit.

1. In no case could the decree in Tennessee affect the title to lands in this state. *6 Pet., 164; 16 Id., 57.* No service was had on Ferguson and no proper decree could be rendered in Tennessee. *15 How., 491; 14 Ohio St., 302; 84 Ill., 417; 25 Am. Rep., 416; 7 How., 583; 16 Id., 1; 1 McAllister, 26.*

2. The proper practice would have been to delay action in Tennessee until a decision was had in Arkansas. *6 Mad. Chy., 18; 1 Phil., 724; 5 Mad. Chy., 184.*

3. The injunction was not void because no bond was given. When no injury can be sustained, the practice is to order injunctions without bonds. *2 C. E. Green, 255.*

Pickett v. Ferguson, et al.

4. But if improperly made, the injunction would not be void, and the party disobeying is liable to punishment. *9 N. Y., 266; 2 Edw. Chy., 188; 3 Meriv., 148; 38 Conn., 121; 3 Swaust., 626; 4 Paige, 444; 2 Green Chy., 456; 4 Beav., 1; 7 Id., 574; 2 Phil., 113; 45 N. Y., 637; 64 Id., 623; 2 Cooper's Dan. Chy. Pr., 1683-4-6.*

5. An injunction may issue to restrain a party from proceeding in a court of another state. *2 Story Eq. Jur., Sec. 875; 22 Wall., 250; 1 High on Inj., Sec. 106; 47 Md., 203; 28 Am. Rep., 448.*

6. An injunction properly granted may be served out of the limits of the state, it being only necessary that the defendant be apprised of the order. *1 High Inj., Sec. 17.*

7. Plaintiff being in contempt, the orders taken below were strictly within the discretion of the court. *8 Porter, 277; 9 Iowa, 209; 16 Ark., 391; 38 Id., 477; 29 Id., 468.*

8. The court properly refused to permit the appellant to dismiss the original bill after the filing of the cross bill. *14 Ark., 666; 29 Id., 622; 36 Id., 517.*

9. The charge that F. & H. promised to give their notes is not proved.

10. The evidence shows that Hanauer bought for himself and sold at an advanced price, but if he bought for F. & H. the case is in nowise different. A tenant in possession may buy his landlord's title at forced sale under legal valid proceedings and set it up in defense to any action brought against him by the lessor. *Wood on Landl. & Ten., Sec. 236; 24 Vt., 165; 18 Id., 346; 6 Conn., 464; 4 Scam., 85; 13 Ill., 241; 30 Miss., 513; 8 Blackf., 350; 47 Mo., 449; 34 N. J. L., 496; 72 Ill., 334; 83 Id., 474; 9 B. & C., 245; 11 Exch., 769; 15 Pick., 147; 13 Metc., 177; 4 Cush., 351; 33 Ark., 194; 22 Wend., 121; 9 Barb., 615; 13 B. Mon., 505; 2 Id., 234; 5 J. J. Marsh, 104; 20 Johns., 51; 69 N. Y., 1; 6 Wend., 671; 6 Dana, 426; 48 Ga., 165; 1 A.*

*K. Marsh, 99; 7 Mon., 104; 9 Wall., 592; Smith's Lead. Cases,*
*Vol. 2, marg. p. 659; 31 Ark., 472; 23 Penn. St., 131; 17 Ark.,*
*546; 21 Id., 160; 7 Id., 320; 10 Humph., 50; 8 Id., 23; Id., 685.*
None of the cases cited in *Story Eq. Jur.* or *Perry on Trusts*
involved the relation of landlord and tenant.

11.   Even if a tenant cannot buy, appellant waived all such
claims by announcing at the sale that the purchaser would get
the lease with the land.

12.   Appellant is estopped by delay and laches.


*Humes & Poston, E. F. Adams* and *L. W. Humes* for ap-
pellees.

If the contempt proceedings were erroneous, the whole
record is now before this court, and it will not reverse if sub-
stantial justice has been done upon the merits.   The injunction
against further proceeding in the Tennessee court was proper.
Courts have the power to do so.   *Story Eq. Jur., Secs. 899,*
*900, 743; High Inj., last ed., Secs. 103–4–5–6.*   And a court
of equity may enjoin the prosecution of suits in foreign tribu-
nals where proper grounds are laid.   *High Inj., Sec. 107; 5*
*Mad. Chy., 190; 4 Allen, 545; 25 Ohio St., 516; 84 Ill., 20; 49*
*Barb., 304; 4 Johns. Ch., 123; 23 N. H., 470.*

No such trust relation exists between landlord and tenant,
so far as paying off incumbrances, taxes, etc., is concerned,
and no such duty is imposed on the tenant by law, as to raise a
trust from failure to perform a duty not assumed or imposed by
law.   The tenant can buy his landlord's title at execution or
judicial sale, and set up the same in defense of an action
brought against him by the landlord.   *17 Ark., 546; 21 Id., 160;*
*33 Ark., 195; Taylor L. & T., 4 ed., p. 455, Sec. 629; Bigelow*
*Estop., 2 ed., 374–5; 6 Wend. 666; 5 Pick., 124; 9 Barb., 615;*
*15 N. Y., 374; 22 Wend., 121–2; 13 Ill., 239; 2 Wend., 507; 17*
*Mass., 439; 15 John., 309; 3 Conn., 75; 8 Humph., 23; 10 Id.,*

*49; Id., 685; 72 Ill., 334; 66 Me., 167; 75 N. C., 455; 61 Mo., 249; 22 Wend., 123; 69 Pa. St., 316; 58 Barb., 545; 99 Mass., 15.* He may show an outstanding title against his landlord when the title has ·expired or been extinguished since the relation between them was created. *25 N. J. L., 1 Duch., 106; 22 N. J. L., 2 Zab., 262; 6 Wend., 666; 8 Ala., 606; 8 Cal., 592; 21 Cal., 309; 5 Conn., 291; 5 Ill., 84; 13 Ill., 239; 8 Black. Ind., 350; 2 B. Mon., 234; 13 Id., 505; 7 Md., 346; 10 Md., 333; 30 Miss., 513; 41 Mo., 447; 18 N. H., 222; 35 N. Y., 615; 1 Sandf., 516; 3 Ohio, 57; 10 Tex., 549; 3 Yerg., 545; 4 Cold., 487; Perry on Trusts, Sec. 207; 6 Tex., 175.*

Plaintiff is estopped by her announcement at the sale that the lease would go to the purchaser. *Bigelow Estoppel, 2 ed., 345; 13 Mich., 239.* An estoppel runs against married women. *30 Ala. 382;, 3 Bush. (Ky.) 702; Acts Ark. 1873, pp. 382–4, Secs. 8–9; 3 Sneed, 376; 4 Baxter, 141; 2 Head, 208.* She is also estopped by her delay, acquiesence and laches. *11 Heisk, 293; Story Eq., Sec. 2036; 10 Humph., 580; 3 Bush., 702., etc.*

The proof fails to show that F. & H. ever agreed to give their rent in notes, or in any way frustrated her in her efforts to redeem the property from the incumbrance on it, or did anything to bring about a sale. But if they did agree to give their notes, and afterwards purchased through Hanauer for themselves, this does not create a trust, but only a breach of contract. *Perry on Trusts, Secs. 124–7, 134–5; 1 Cooper Chy., 329; 2 Id., 216; 29 Ark., 613; 4 Humph., 233; 55 Penn. St., 125; 3 Sneed, 461; 7 Baxter, 449.*

The lease is silent, and parol testimony not admissible to show an agreement to give the notes. *6 Cold., 166; 4 Heisk, 491; 5 Cold., 187; 1 Humph., 150; 2 Kent Com., 627; 2 B. & C., 627; 1 John Chy., 273; 3 Johns, 68; 12 Id., 488; 4 Com., 428; 9 Yerg., 266; 2 Tenn. Chy., 723; 1 Greenl. Ev., Sec. 275; 4 Ph. Ev., 295; 1 Cox C. C., 407; 4 Sneed, 512; 7 Hum., 349; 1*

*Pet., 1; 11 Paige, 660; Chitty on Cont., 102; 2 Lea, 729; 1 Cold., 39.*

But if the promise was made subsequently, it was *nudum pactum.*

Supplemental brief by *E. F. Adams* for Appellee.

Plaintiff could not dismiss her bill after cross-bill filed.   *14 Ark., 666; 29 Id., 622; 36 Id., 518.*

The chancery court of Tennessee had no jurisdiction, the lands being in Arkansas and Ferguson a resident of Arkansas not served with process.   *Wharton Confl. Laws, Sec. 290, p. 264; Am. Law Reg., Nov., 1883, p. 1; 31 Ark., 377; 20 Id., 12; 16 Id., 55; 106 U. S., 350; 95 U. S., 714; 37 Ark., 516.*

An injunction binds a party from the time he is informed thereof.   *Gantt's Dig., Sec. 3468.*   If erroneous, it must be obeyed.   *39 Ark., 82; High Inj., Sec. 847, 2 ed.; 9 N. Y., 263; 4 Paige, 444; 45 N. Y., 637.*   The violation of an injunction is a contempt.   *High Inj., Sec. 849.*   Even if done under advice of counsel.   *Ib., Sec. 851.*   One in contempt will not be heard, *Ib., Sec. 875; 1 Stoct., 110.*   Neither to prosecute or defend on the merits, *8 Porter, (Ala.), 277.*   Courts of one state will enjoin parties within its jurisdiction from prosecuting suits in another state.   *5 Mad., 184; 25 Oh. St., 516; Whart. Confl. Laws, Secs. 278–9–80.*

The case was also argued orally by solicitors.

SMITH, J.   In November, 1877, Ferguson & Hampson, merchants and partners, trading at Memphis, in Tennessee, accepted from Mrs. Pickett and her husband a lease of the plantation, Nodena, lying in Mississippi county, Arkansas, for the term of five years, to begin on the first of January then next ensuing. They stipulated to pay, on the first of December in each year,

a certain rent for each acre of tillable land, the area to be de-termined by an actual survey, and to repair the fences and buildings. They were to enjoy free of rent any land which they should themselves clear and put into cultivation; but Mrs. Pickett was not to be charged with the value of any improve-ments. According to the survey, made about the same time, the rents reserved amounted to $3510 per annum.

At the time this lease was executed, the plantation was in-cumbered by a deed of trust, the debts secured thereby aggregating about $20,000, and a decree of foreclosure had been rendered by the circuit court of the proper county; but the cause was pending in this court, on appeal. Soon after-wards a decision was reached, which is reported in *32 Ark., 346*, under the style of *Pickett v. Merchants National Bank*. And pursuant to that decree the clerk and master of this court sold the premises on the 28th of February, 1879, to Louis Hanauer, for the price of $18,001. The sale was approved and a deed executed to the purchaser.

Mrs. Pickett was, at the date of the lease and of the sale, the owner of the equity of redemption. Her lessees were not parties to the foreclosure suit, but coming in. *pendente lite* were chargeable with constructive notice and had, besides, actual notice of the pendency and status of the litigation. The rent for which they were liable for the year 1878 remained unpaid. And they had also, about the 21st of May, 1878, collected $536.33 of insurance money belonging to Mrs. Pickett, which they refused to pay over. She accordingly brought her action in the circuit court of Shelby county, Tennessee, against them to recover this rent and insurance money. The defendants claimed, to recoup the damages they had sustained by their eviction under the foreclosure sale. The jury returned a ver-dict of $3000 for the plaintiff. Mrs. Pickett having moved for a new trial, the court declared the verdict to be too small, and gave the defendants their option, either to consent that the

1. PURCHASE *pendente lite*. Constructive notice.

amount of recovery be increased to $3850 or to submit to another trial. As they refused to raise the verdict, a new trial was granted. Mrs. Pickett now dismissed her action at law and filed her bill in the chancery court of Shelby county against them and Hanauer. In the trial of the action at law, it had been developed that Hanauer's purchase was made at the instance and for the benefit of Ferguson & Hampson, and that he had subsequently quit-claimed to them, they remaining all the time in possession. The theory of Mrs. Pickett's bill is, therefore, that Ferguson & Hampson were the real purchasers at the foreclosure sale, and that, by reason of the relation they sustained to her, their purchase enured to her benefit. She prays to redeem, upon the terms of refunding the purchase money actually advanced by Hanauer, less the amount due her by Ferguson & Hampson for insurance collected by them and not accounted for, and less, also, the rents of the place that accrued both prior and subsequent to the sale.

Process was duly served upon Hanauer and Hampson, but there was no service upon Ferguson, except constructive service by publication in a newspaper, nor did he appear to the suit. He had, long before the bill was filed, removed his family from Memphis and had taken up his permanent residence on the plantation, and had become a citizen of Arkansas. His connection with the firm of Ferguson & Hampson still continued, and down to the time of filing the bill he was in the habit of visiting Memphis frequently, but thereafter he systematically avoided going into Tennessee, for the avowed purpose of preventing the service of process upon him.

While the cause was still pending in the chancery court of Shelby county, Tennessee, Mrs. Pickett filed a substantial copy of her bill in the circuit court of Mississippi county in this state. She charges that the original agreement between her and her tenants had been that they should make their rent notes payable to her order, so that she might sell or hypothe-

cate them in the market, and thus raise funds to pay off the decree against Nodena; but that this stipulation was not inserted in the lease, because the acreage was not then certainly known, and the lessees had afterwards fraudulently refused to give their notes, with a view to cripple her resources and precipitate a sale, to the end that they might themselves become the purchasers. She avers that she also owned a valuable residence property in Memphis, which one of the beneficiaries in the trust deed had offered to take in satisfaction of his claim, amounting to $8508.58; and that, if her tenants had not thwarted her purposes, she could have satisfied the other creditors and have averted a sale. The prayer was that the bill might be retained until the final determination of the suit in Tennessee, to the end that if the plaintiff should be successful there, she might, by appropriate supplemental pleadings, enforce her equities thus ascertained by a decree here operating directly on the title of the lands, and if she should be defeated there, upon any grounds not concluding the merits, as for example, on account of the absence of Ferguson, then she might be permitted to prosecute her bill as an independent suit for redemption; and in the event that she failed to establish her right to redeem, she prayed to recover of Ferguson & Hampson her insurance money and the rents for 1878.

To this bill the three defendants filed a joint answer, which was made a cross-bill. They denied that Ferguson & Hampson were the real purchasers at the foreclosure sale; but admitted that Hanauer had bought at their suggestion, and for their protection against irreparable injury, they having expended several thousand dollars in the year 1878 in repairs, fencing and clearing land, and in preparations for planting during the term of their lease, and being in danger of losing the benefits of these improvements and outlays by the impending sale, which Mrs. Pickett was powerless to prevent, she being, as it was alleged, utterly insolvent. They further admitted that Hanauer, about

one year after the sale, had resold and conveyed the plantation to his co-defendants for $22,541, of which sum $9000 were paid in cash, and for the remainder, notes secured by a mortgage on the place were given, which were still unpaid. They denied that Ferguson & Hampson had ever agreed to make their notes for the rent. They admitted the non-payment of the insurance money and rent for 1878, but justified the detention of those sums to reimburse themselves for the loss of their term by the constructive eviction of themselves and determination of the tenancy by the foreclosure sale. They denied Mrs. Pickett's right to redeem upon any terms, and alleged that since the purchase they had expended $25,000 in improvements, consisting of a fine steam gin, thoroughly equipped with machinery of the latest pattern, the erection of a barn, two store houses and more than fifty tenant houses, the building of a levee along the Mississippi river three-quarters of a mile long, the clearing and fencing of seven hundred acres of land, etc. And because the Tennessee court was unable to do complete justice in the premises for the want of jurisdiction over the person of Ferguson, and litigation there was likely to result in casting a cloud upon the title, it was prayed that Mrs. Pickett and her solicitors might be enjoined from prosecuting that suit. A temporary injunction was awarded; but it was disregarded, after knowledge that it had issued, and the cause in Tennessee was pressed to a decree. Mrs. Pickett was accordingly adjudged to be in contempt. She afterwards offered to file a plea to the jurisdiction of the court, alleging her residence in Tennessee and that she had not been served with a subpœna to answer the cross-bill; but the court declined to entertain her plea until she had purged her contempt by procuring the decree in Tennessee to be set aside. She then asked leave, successively, to file a demurrer and answer to the cross-bill, and a motion for a continuance, and finally to dismiss her bill without prejudice. But the court refused to hear her, or to permit her to take any further steps in the cause until she obeyed the injunction. On

Pickett v. Ferguson, et al.

the final hearing Mrs. Pickett was not permitted to introduce any evidence; but the opposite side read all of the records, papers and depositions, taken in behalf of both parties, that were used on the trial of the case in the chancery court of Shelby county.    Mrs. Pickett's bill was dismissed and upon the cross-bill it was decreed that the order restraining Mrs. Pickett from prosecuting her suit in Tennessee be perpetuated and that the title of Ferguson to the lands in controversy be quieted as against her claims.    No decree was made in favor of Hampson or Hanauer on the cross-bill, presumably for the reason that the Tennessee court had retaliated by an order restraining the prosecution of the suit in Arkansas, and they, being subject to that jurisdiction, did not desire to fall under the displeasure of the court.    From this decree Mrs. Pickett has appealed.

The case involves several questions of practice, which we have found to be more difficult of solution than the merits of the controversy.    And first, as to the restraining a party from proceeding in the courts of another state; this is a matter of very great delicacy, almost inevitably leading to distressing conflicts of jurisdiction.    For this reason the courts of some states, notably those of New York, have declined to interfere in such cases.    But the jurisdiction is established by the clear weight of authority, as well as by the necessity of interposition under special circumstances where the foreign suit appears to be ill calculated to answer the ends of justice.    *Sto. Eq. Jur., Secs. 899-900; 1 High on Injunction, and cases cited; Bushley v. Munday, 5 Madd. Chy., 184; French v. Hay, 22 Wall, 250; Dehon v. Foster, 4 Allen, 545; Carron Iron Co. v. McLaren, 5 H. L. Cas., 416, 438; 2 Lead. Cas. in Eq., 4 Am. Ed., 1396.*

The fact that the real estate, which is the subject of controversy, was situate in Arkansas, was not an insuperable obstacle in the way of doing complete justice by the Tennessee court. But as a court of equity in such cases acts *in personam*, it must have jurisdiction over the parties in order to administer the

2. CHANCERY JURISDICTION: To restrain suits in other states.

cause.   Ferguson, an indispensable party to the litigation, was absent.   Mrs. Pickett was thus forced to seek the assistance of the courts of this state.   The two suits involve precisely the same questions between the same parties.   The defendants to the suit last instituted in effect say:   "The property is here. The matter in controversy depends on the laws of Arkansas. The parties are all now before the court, which is not the case in the Tennessee suit.   We insist that the whole controversy shall be settled here, and Mrs. Pickett be required to stay proceedings in Tennessee, as a vexatious harassment of us for the same cause of action, when it is evident that the result there will not finally conclude the rights of all the parties."   Acting upon these suggestions, the circuit court construed the filing of the bill to be an election by Mrs. Pickett to transfer the whole litigation to this forum.   Such was not in reality her intention, but only to affect any purchaser of the property with notice by a *lis pendens*, and possibly to acquire undoubted jurisdiction over Ferguson.   She therefore filed what her counsel styles an auxiliary bill, to hold the property until the determination of the suit in Tennessee, and then to carry the decree into effect if it should be favorable to her.   But we are not aware of any precedent for such a bill.   Between the courts of the several states there is no connection or dependence so as to render them subservient to each other.   It is only such rights as have been ascertained by a concluded litigation that the courts of other states undertake to enforce.   The court below properly assumed jurisdiction over the entire controversy.   Mrs. Pickett had voluntarily submitted her rights to its determination and had invoked its aid.   The very act of filing the bill implied this and could legally mean nothing less.

And there was an equity to restrain the prosecution of the suit in Tennessee, since it appeared that the court there had no jurisdiction over the person of Ferguson and could make no decree which would bind him.

Pickett v. Ferguson, et al.

But it is said that the punishment visited upon Mrs. Pickett for her contumacy was excessive, extending to a deprivation of her status in court and of her right to defend against the cross-bill ; and the utmost the court could lawfully do in that behalf was to deny all applications addressed to the favor of the court, and not matters of common right. A court of equity has the power to refuse to hear a party, when he is in contempt for disobeying its order. *Walker v. Walker, 82 N. Y., 260,* and authorities cited. It is indeed rarely exercised, for it is seldom necessary to go so far. *3. SAME: Refusing to hear party in contempt.*

In *Casteel v. Casteel, 38 Ark., 477,* the plaintiff being in contempt, his bill was dismissed and the cause was heard on the cross-bill alone.

But whatever errors the court below may have fallen into in this respect may be corrected here. All of the pleadings, papers and motions which Mrs. Pickett proposed, but was not allowed, to file, have been brought up by bills of exceptions. And although she was refused the privilege of adducing testimony, yet the opposite side read all of the evidence that had been taken in behalf of either party in the Tennessee suit. This evidence was quite voluminous, covering more than one thousand pages. And it was conceded on the oral argument that it embraced all of the evidence materially bearing upon the case that was accessible. The depositions of all the witnesses who were in a situation to know any of the facts likely to affect the decision were taken at great length, and under circumstances most favorable to elicit the whole truth; and some of the more important witnesses were repeatedly examined. So we feel assured that we are as completely in possession of the facts of this case as it is possible to be in any case of like nature where the facts are disputed. And it is our invariable practice not to remand chancery causes for further proceedings and proofs, where we can plainly see what the rights and equities of the *4. PRACTICE IN SUPREME COURT: Remanding chancery causes for further proof.*

parties are, but to render such decree here as should have been rendered below.

5. JUDGMENTS AND DECREES: Void as to parties not served.      In her answer to the cross-bill, Mrs. Pickett contended and now contends, that the decree pronounced by the chancery court of Shelby county, Tennessee, after the filing of the cross-bill, was a conclusive adjudication between the parties to this suit, settling their respective rights in the premises, and forever estopping the plaintiffs in the cross-bill to aver or prove anything to the contrary in any other court where the same matters might be brought into question. Laying out of consideration the fact that this decree was entered up on the motion of her solicitor, in violation of the injunction from the Arkansas court, and looking at it as if no such injunction had issued, the conclusiveness of the decree will depend on the jurisdiction of the court which rendered it. It is not our purpose to inquire what effect the failure to get Ferguson before the court had upon its jurisdiction to proceed to a final determination as to the remaining defendants. No affirmative relief was granted in the present suit to Hampson or to Hanauer, and they have not appealed. Now, as Ferguson was neither personally summoned, nor voluntarily appeared in the Tennessee suit, and was not even a citizen of that state, no court sitting there could render any judgment against him which would be recognized elsewhere as of any validity. Such a judgment is treated in other jurisdictions as a mere nullity. Nor does it alter the case that Ferguson was a member of a commercial partnership whose *situs* was in Tennessee. *Iglehart v. Moore, 16 Ark., 46; D'Arcy v. Ketchum, 11 How., 165; Public Works v. Columbia College, 17 Wall., 521; Pennoyer v. Neff, 95 U. S., 714; St. Clair v. Cox, 106 U. S., 350.*

6. CHANCERY PRACTICE: Dismissal after cross-complaint.      The court was right in refusing Mrs. Pickett leave to dismiss her bill without prejudice, after the answer, in the nature of a cross-bill, had been filed. *Allen. v Allen, 14 Ark., 666.*

This brings us to the merits.  And here it must be con-
ceded, we think, that the purchase of Nodena by Hanauer was,
in legal effect, a purchase by Ferguson & Hampson.  Han-
auer, it is true, used his own money in paying for the place.
Indeed, the evidence shows that it was entirely beyond the
power of Ferguson & Hampson to raise so considerable a
sum of money within so short a time.  They were a young
firm in good credit and excellent commercial standing; but
their capital was extremely limited.  And this was probably
the chief reason why the purchase was made in the name of
another, and not a desire to conceal their interest in it on ac-
count of any supposed incapacity on their part to bid owing
to their relations with Mrs. Pickett.  Hanauer was a wealthy
merchant, closely connected with Hampson by family ties, and
with the firm by business ties.  He was willing to assist these
young men out of the predicament in which they had involved
themselves by taking a long lease of a mortgaged plantation,
that was now advertised for peremptory sale, and to furnish
the money to buy it.  But he must have security.  The plan-
tation itself was a sufficient security, and one which it would
not embarrass Ferguson & Hampson to give.  So he takes
the legal title in his own name.  Perhaps they might never be
in a condition to take the land off his hands.  In that event he
would simply have made an investment.  Thus, without any
very definite understanding as to the terms upon which Fergu-
son & Hampson were to have the benefit of his purchase,
Hanauer bought Nodena.  Perhaps no trust arose to them out
of this purchase which a court of equity would enforce.  Per-
haps a refusal by him to convey would have been a mere vio-
lation of a parol agreement: *Perry on Trusts, Sec. 134; Will-
iard v. Williard, 56 Pa. St., 119.*  Still, the fact remains, that
he purchased for them and not for himself.  He did not expect
to hold the land, but to resell to them.  And he did afterwards
convey to them.  True, he charged them an advance of some

12——45

$4500. But this was only a bonus for the accommodation, or a compensation for his risk and the use of his money.

7. LANDLORD AND TENANT :— Tenant's p ur- chase o f land- lord's title.

We must then look at the case as if Ferguson & Hampson had been the bidders at the judicial sale. Now it is claimed that they, being tenants to Mrs. Pickett, could not bid, and that if the property was stricken off to them, they would be held in equity as trustees, and could only hold the title as security for the reimbursement of the amount expended.

Judge Story, in discussing the subject of constructive frauds practised by persons standing to each other in confidential relations, enumerates "the cases which arise from the relation of landlord and tenant, of partner and partner, of principal and surety, and various others, where mutual agencies, rights and duties are created between the parties by their own voluntary acts, or by operation of law." *Eq. Jur., Sec. 323.* And in *Perry on Trusts, Sec. 210,* it is said: "The relation of land-lord and tenant, partner and partner, principal and surety, and tenants in common, may create such influences of trust and confidence that courts of equity will construe a trust to arise out of their contracts, or will decree such contracts to be set aside."

But none of the cases cited in support of these sections were cases between landlord and tenant.

In *Scott v. Levy, 6 Lea., 662,* where a sub-lessee purchased the lease-hold estate at an execution sale against his lessor, Mr. Justice Cooper, speaking for the court, says: "Besides, Moses Levy, at the time, by reason of his possession of the lease-hold property under his sub-lease, occupied such a fidu-ciary relation to his lessors, that he could not acquire a valid title against them by reason of the purchase of the property under an incumbrance. All he could do, would be to hold his lessors liable, under the covenant for quiet enjoyment, or war-ranty of title, for the amount expended in removing the incum-brance." But as it had already been decided that there was

no judgment in evidence to support the execution, and as, moreover, proof seems to have been offered of a contract between Levy and his lessor, that he should hold his purchase only as security for repayment, we cannot regard this as anything more than the expression of an opinion, by a very great judge in equity, that a tenant cannot buy his landlord's title under execution and hold it for any other purpose except security.

There is, however, one case—*Lansman v. Dralos, 10 Neb., 172*—which goes to the full length contended for by Mrs. Pickett's counsel. That case asserts that, if a tenant in possession purchases the leased premises without surrendering his lease, or notifying his landlord, it will be presumed the purchase was made to protect his possession, and the landlord may redeem.

These are all the authorities on this point, favorable to Mrs. Pickett, that the industry of her counsel has been able to collect. On the other hand, it is settled law in this state that a tenant, who is under no obligation to pay the taxes, may purchase at tax sale the lands of which he is in possession and may set up such title, and the sale, if otherwise valid, extinguishes the landlord's title and cuts off the lease. *Bettison v. Budd, 17 Ark., 546; Ferguson v. Etter, 21 Id., 160.* See also *Higgins v. Turner, 61 Mo., 249.* And in *Brittin v. Handy, 20 Ark., 381,* it was ruled that unless some fraud can be shown to have been perpetrated, one tenant in common may purchase at forced sale the moiety of his co-tenant, and may retain and assert the title thereby acquired, as fully as if he were a stranger to the defendant in the judgment. The same principle is announced in *Freeman on Co-Tenancy ond Partition, Sec. 165.*

So it is laid down in the text-books, and has been frequently decided, that a tenant may purchase the demised premises at an execution or judicial sale against the landlord, and that in any subsequent controversy between the parties relating to the possession, or the payment of rent, it may be shown that the landlord's title has expired and the estate become vested in the

tenant.   *1 Wash. Real Estate, 3 ed., 361; Taylor's Landlord &
Tenant, Sec. 705; Wood on Same, Sec. 236; Bigelow on Estop-
pel, 2 ed., 374; Nellis v. Lathrop, 22 Wend., 121; Hetzie v.
Barber, 69 N. Y., 1; Ryder v. Mansell, 66 Me., 167; Elliott v.
Smith, 23 Pa. St., 131; Wolf v. Johnson, 30 Miss., 513; Camley
v. Stanfield, 10 Texas, 546.*

And in none of these cases is it intimated that while at law
the tenant may purchase, yet in equity he cannot hold against
the landlord's option to redeem.   On the contrary, in *Casey v.
Gregory, 13 B. Mon., 505*,—a chancery case—it is said that the
landlord has no more right to redeem in such a case than if the
purchase had been by a stranger.

The obligations of a tenant are to pay his rents and to sur-
render possession at the expiration of his term.   He cannot
dispute the title under which he entered.   He cannot buy in
an outstanding title and set it up against his landlord.   He
cannot use his possession as a basis to acquire title as an actual
settler, and thereupon found a claim hostile to his landlord:
And any title which he obtains in his own name, by means of
his personal residence, he holds for the benefit of his landlord.
*Waggener v. McLaughlin, 33 Ark., 195; Chavinger v. Reiman, 3
W. & S., 486.*   The foundation of the rule is an enjoyment by
permission.   And as the estoppel begins by permissive posses-
sion, it continues only so long as possession is retained by
permission.   If the tenant is evicted, he no longer owes allegi-
ance to one who does not protect him.   Consequently, if the
landlord, by the determination of his title after demise, loses
the power to permit possession, the tenant owes him no duties
for the future.   *Bigelow on Estoppel, 351.*

Now, the reasons which prevent a tenant from purchasing
and asserting an adversary title have no application when it is
the landlord's own title that he buys.   In this case he does not
deny the landlord's title, but affirms it.   There is no doubt he
may buy of the landlord at private sale.   What considerations

then of law or public policy prevent his bidding when his landlord's title is exposed at an involuntary sale? What duty, inconsistent with his right to purchase, does he owe his landlord? The bidding is open to all the world and the injury to the landlord is no greater than if any other person had bought; if, indeed, that can be called injury which happens by operation of law, and by the act, consent or neglect of the judgment defendant.

But it is claimed that the sale was brought about by the failure and refusal of Ferguson & Hampson to perform the duties which they owed to Mrs. Pickett—that if they had paid her what was due her by contract and had made their rent notes, she, with the aid of her Memphis property, would have been able to relieve Nodena from the encumbrance. At the date of the foreclosure sale, the mortgage debts amounted to more than $20,000. The Memphis property was totally unavailable for Mrs. Pickett's purposes. The creditor whom she

8. EVIDENCE—PAROL: To enlarge written contract.

was trying to induce to take it for his claim, consented to do so only' upon the exhibition of a clear title. Upon investigation it turned out that the legal title was not in Mrs. Pickett, but in a trustee for her and that the trustee was dead. A bill was filed for the appointment of another trustee. But it seems that the original trustee was invested with a large discretion in consenting, or refusing to consent, to any disposition of the *corpus* of the estate which the beneficiary might propose to make. And the question arose whether the court could clothe the new trustee with the same powers and discretion which the creator of the trust had vested in a trustee of his own selection. This question, as we understand, the chancery court of Shelby county answered in the negative. And although it is shown that the decree was afterwards reversed by the supreme court of Tennessee, yet the reversal came after the master had sold Nodena.

Then as to the agreement to give notes, the lease itself, which is the best evidence of the terms of the contract, contains no such stipulation, and this is not a bill for reformation. The suggestion of the reason for its omission, that the acreage was unknown, is not at all satisfactory; because if that were a term of the contract, it might have been expressed in six words, though the number of acres might require to be ascertained by a subsequent survey. The evidence is very conflicting upon the point whether such an agreement was ever in fact made. Certainly it would have been a very foolish thing to do, knowing, as Ferguson & Hampson did, that Mrs. Pickett was a married woman, whose ability to respond in damages was not great, even if she were liable at all; and that the plantation was under mortgage, to foreclose which, proceedings were then pending. It would have been to put themselves completely in her power and at her mercy. For what security would they have that the money raised upon the notes would be applied to the payment of the mortgage debts? If made, the notes would belong to Mrs. Pickett; she might negotiate them and apply the proceeds to any purpose she saw fit. Thus the tenancy might be determined by an eviction and yet the tenants remain liable to pay the notes. And Ferguson & Hampson had been advised by counsel not to incur this risk.

But whatever the agreement on this point may have been, our opinion is that parol evidence of its terms was inadmissible in this suit. The parties have deliberately reduced their engagements to writing. There is no averment that owing to fraud, accident or mistake, the writing does not fully express the concurrent intentions of the parties. And "all antecedent propositions, negotiations and parol interlocutions on the same subject are to be deemed merged in" the written contract.

9. Tenant withholding rent to meet damages from apprehended eviction.

Ferguson & Hampson had, however, no just cause or legal excuse to withold from Mrs. Pickett her insurance money and

Pickett v. Ferguson, et al.

the overdue rents. They claimed to do this to cover their damages from an apprehended eviction. There is in the lease no express covenant for quiet enjoyment; but doubtless such a covenant is implied in every mutual contract for leasing land. But a tenant cannot set up apprehended difficulties of this character to defeat the payment of his rents. These sums amounted to more than $4000. But there is no reason to suppose that, if they had been paid promptly into her hands, as they should have been, Mrs. Pickett could have averted the sale of Nodena. Hence that sale can not be said to have been occasioned through the fault of the lessees. And in not providing in its decree for the payment to Mrs. Pickett of these several sums, with interest, the circuit court committed an error to her prejudice.

*10. Lease:—*
*Covenant for*
*quiet enjoyment*

A personal judgment will be entered here in favor of Mrs. Pickett against Ferguson & Hampson for $536.33, with six per cent interest per annum from May 21, 1878, and for the further sum of $3510.10, with a like rate of interest from December 1, 1878. Mrs. Pickett will recover her costs in this court.

EAKIN, J. *Dissenting.* I am constrained, by the importance and delicacy of the matters involved, to express at some length my dissatisfaction with the opinion of the court. The subject matters of litigation in these cases grew out of those involved in the case of *Pickett, et al., v. Merchants National Bank of Memphis, et al.,* decided by this court at the November term, 1877, and reported in *32 Ark., 346.* The matters are so interwoven that a reference to the facts found and orders made in that case is essential to a clear understanding of the condition of affairs at the time of the transactions out of which the present litigation arose.

After a statement of the account therein ordered, the "Nodena plantation" was sold by the clerk of this court, as commissioner, on the 28th day of February, 1879, for payment

of the liens and incumbrances, ascertained by the account, and decreed by the court. By the order for sale the commissioner was directed to put the purchaser in possession. He reported that he had sold it to Louis Hanauer, for the sum of $18,001, of which $1000 had been paid in cash; and that Hanauer had given his note, with approved security, for the balance. With regard to the possession, he reported: "That is satisfactory, as the purchase was for the benefit of the parties in possession under a lease." This report was duly confirmed by this court, on the 8th of March, 1879, and on the 25th of October following, all the purchase money having been paid, the clerk executed to Hanauer a deed which was acknowledged in open court and approved.

It appears from the transcript of that case, on file here, and which by bill of exceptions has been incorporated with the evidence in this, that the equity of redemption of said Nodena place had, subject to the incumbrances, been conveyed by Saffarans, the former owner, who created them, to Mrs. Mary E. Pickett and her daughter. It now further appears that Saffarans afterwards married the daughter, and that they, together, on the 31st day of January, 1873, conveyed their half interest also to Mrs. Mary E. Pickett. She thereby became the equitable owner against whom the former foreclosure was directed, and who would have held the property as her own in case of payment before sale. She and her agents, after these conveyances, controlled the property pending the former litigation. This at least must be taken as true for the purposes of this case.

The present appellees, Ferguson & Hampson, composed a commercial firm, doing business in the city of Memphis, and engaged also in planting upon divers plantations in Arkansas. The domicile or central business office of the firm was at Memphis where Hanauer resided. Both members of the firm had resided there personally, and were residing there when the

matters occurred which gave rise to the original bill in this case. Mrs. Pickett resided in Maury county, Tennessee. In short, all the parties were Tennesseeans at the time of the occurrences upon which any of the parties now before us base their equitable claims.

Pending the former suit, in this state, of which Ferguson & Hampson were well advised, they recognized Mrs. Pickett as the true owner subject to the incumbrances. They rented from her a portion of the lands in 1877, for planting purposes, and had taken a lease of the gin house, machinery, cotton pens, etc. for six months from the 1st of September, of that year. On the 12th of November, following, by a written agreement between Mrs. Pickett and her husband on one part, and the firm of Ferguson & Hampson on the other, the latter accepted from Mrs. Pickett a lease of a very large part of the Nodena place, for five years from the 1st of January, 1878. The lands are described by the metes, bounds, and names of certain fields, the number of acres in which are not given; but the rent for which is stipulated at so much per acre when ascertained. It was expressed that Mrs. Pickett should employ a competent engineer to make a survey and plat, which was to be accepted by both sides as correct in fixing the amount of annual rent. The lessees were authorized to clear and use, free of rent, any other lands belonging to the plantation; and upon their part agreed to take the premises in their present condition, to refence the place and keep it and buildings in repair, subject only to destruction by the elements and usual wear. They further agreed to repair the machinery on the place, to use it carefully, and leave it on the place, together with any more they might put there. It was expressly stipulated that no charge should be made by them against Mrs. Pickett for any improvements not stipulated in the lease, nor assented to by her "or her assigns." A small strip of land in one of the enclosures, of ten or twelve acres, was to be free of rent for the first year. Under this lease the firm was put in possession.

Pickett v. Ferguson, et al.

In the previous six months' lease of the gin, machinery, etc. it had been expressed that the same had been taken in consideration and satisfaction of a debt of $780, then due said firm from Mrs. Pickett and her son, provided said lessees should be secured in the peaceable use and possession of the premises. It was agreed also, in that lease, that the firm should effect an insurance on the buildings, machinery, etc. to the amount of $2000, the premium to be paid equally by the lessor and lessees. In case of loss by fire the amount adjusted was to be paid one-half to each—the portion paid the firm to be merely for their indemnity and security; to have the whole amount apportioned so that the firm should receive as many sixth parts of $780 as there might remain unexpired months of the lease. The balance was to be paid Mrs. Pickett. The firm were authorized to effect any additional insurance for their exclusive benefit.

Insurances were made, and a loss by fire occurred in February, 1878. Each party collected a portion of the insurance money. Concerning this matter it is enough to say, that all parties agree that the firm received the sum of $536.33, for which in the absence of any equity to retain it they ought to account with Mrs. Pickett. This they have never paid, nor would they pay the rent of the first year on the five years' lease, which fell due on the 1st of December, 1878.

It will be observed that these several leases were made pending the appeal here of the case of *Pickett v. Merchant's National Bank*, in which it was determined what the incumbrances upon the property were which Mrs. Pickett was bound to discharge to prevent an adverse sale. Of this suit, though not parties, the lessees were thoroughly cognizant; or, if not so, they must have shut their eyes to such notice and information as would have put any sensible and prudent men upon inquiry. The decision here fixing the rights of the parties, and showing with a tolerable degree of approximation what the

liabilities might be, was rendered in December, 1877, before the beginning of the five years term.

In March, 1879, she began an action at law against the lessees in the circuit court of Tennessee for Shelby county, in which Memphis is situated, to recover the rents for 1878, and the balance of the insurance money, claiming for the former the sum of $3510, and said balance of $536.33 on the insurance. No objection was made by defendants as to the amounts. The defense was (as Mrs. Pickett alleges) that the defendants were entitled to recoupment on account of their eviction from the premises, resulting from their purchase at the commissioner's sale, under the decree of this court. The cause was tried on the 3d day of February, 1881.

She obtained a verdict for $3000, and being dissatisfied, moved for and was granted a new trial. Afterwards she dismissed the suit, and on the 18th of the same month filed a bill in chancery against Hanauer and the members of the firm. The object of that bill was to hold the defendants responsible for a fraudulent combination in violation of the relation of landlord and tenant, by and through which the members of the firm had thwarted and defeated her efforts to raise the money to pay off the incumbrances, had made a sale necessary, and themselves become the purchasers. The object of that suit was to assert her right to redeem from her tenants, on payment of what they had advanced, to hold them accountable for rents and insurance, and to declare them trustees of the legal title for her use. She alleges that before the trial of the suit at law, she was not aware that Hanauer had bought at the sale for the benefit of Ferguson & Hampson.

In the Tennessee chancery suit there was a personal service on Hanauer & Hampson; none on Ferguson. The parties served filed a plea in abatement, denying the jurisdiction of the court, upon the ground that the property lay in the State of Arkansas, and that Ferguson, at the time of filing the bill,

was a resident of that state, and had never been served with process. This plea the court overruled. Service upon Ferguson was made by publication as provided by the statutes of Tennessee, and on the 9th day of June, 1881, judgment was entered against him *pro confesso*. On the 6th of August, or thereabouts, Hanauer and Hampson answered the bill. On the 31st day of May, 1882, the cause was heard on the pleadings, the proof, and the order *pro confesso*, and was taken under advisement by the court.

In this condition of affairs the present original bill in equity was filed in the circuit court for the county of Mississippi, in this state,—the county in which the lands in controversy lie. It is brought by Mary E. Pickett, by her husband and next friend, W. S. Pickett, against Ferguson, Hampson and Hanauer. It sets forth substantially all the matters above detailed, being in all essential particulars the same as the bill in the Tennessee chancery court, showing or attempting to show her equity to redeem the land, upon the ground that it was really purchased at the sale for and on behalf of her tenants, and by them in fact, using Hanauer's agency to conceal the nature of the transaction, claiming the equity on account of the confidential relation without regard to the fraud; and also on account of special circumstances of fraud, consisting in this, that they had intentionally thwarted her efforts and disappointed her expectations as to raising money to discharge the incumbrances so as to prevent a sale. The gravamen of the charges relied upon in this view was, that they had, contrary to a mutual understanding at the time of the lease, refused to execute notes for the annual rents, which she might have used as securities, and had withheld the payment of the first year's rent after it became due, and had refused to pay over to her the money due on insurance. She alleges that but for these things she could, by using a valuable residence which she owned in Memphis, in addition to the money which she could have raised on the notes,

and the cash actually due her, have so satisfied the incumbrances that a sale would not have been necessary. The tenants might have been fully protected in the enjoyment of the lease, and she might have preserved the property. She charges that the conduct of defendants was of set purpose so to embarrass her as to make the sale inevitable, and thus acquire the plantation for themselves, which they were enabled to do by the aid of Hanauer, who lent his name in making the purchase, and then conveyed to them. There are other allegations in support of her equity not necessary to be detailed as they are of an evidentiary character. Enough has been stated to show the foundation of her claim.

Her prayer is that this bill should be entertained by the court, and kept alive, as ancillary to the Memphis suit, making a *lis pendens* here where the property is situated, to the end that if she may succeed in sustaining her Tennessee suit, she may have the aid of the chancery court here to make her relief effectual, upon supplemental pleadings; or if the Tennessee suit should fail for want of jurisdiction, which question had been again made in the argument of the Memphis cause, or should fail from any other reason not involving the merits, that then this suit should be retained as an original bill for relief, in which she may be allowed to redeem on paying what the court may find to be justly due; or, failing that, for the recovery of rents for the first year and the insurance money in the hands of Hampson & Ferguson. There is also a prayer for general relief. Throughout she insists, however, that the Memphis court has proper jurisdiction; that the firm is domiciled there; that the members of it resided there, and that Ferguson's change of residence to Arkansas was colorable in order to elude the jurisdiction.

The defendants all answered, and Ferguson & Hampson made their answer a cross-bill to quiet their title against the claims of Mrs. Pickett.

They deny title in her at the time of the lease, which may be passed without further notice, as they voluntarily became her tenants and took possession under her. They deny that the purchase by Hanauer, at the commissioner's sale, was for them, but admit that he obtained a discount upon one of the incumbering debts, of $100. They admit that they received of the insurance money the sum of $536.33, belonging to Mrs. Pickett, and that they did not pay her the first year's rent, but say they retained those sums to indemnify themselves for losses on the rent contract. They say they were damaged by eviction, having spent several thousand dollars in putting the place in good order for cultivation for the next four years. They concede that Hanauer bought with a view to favor them, but without any contract to that effect; and that he, afterwards, voluntarily sold the place to them for $22,500, of which $9,000 has been paid. They claim that he was an innocent purchaser, and that his innocence, in any view of the case, protects them. They deny the allegations of fraud, or that Mrs. Pickett was in condition to pay off the incumbrances, or had the ability to make any arrangements to do so. They insist, moreover, that the claim is stale, inasmuch as she delayed suing for three years after the purchase by Hanauer, knowing that he had conveyed to them, and that they were putting up valuable improvements. They claim, on account of improvements and losses on the first year, the sum of $7213.66 1-3, and allow Mrs. Pickett a credit for rent and insurance of $4046.33, showing balance claimed of damages, of $3171.33. They have other claims in inflammation of damages, one of which, a loss of two dollars per acre each year on the tillable land, which, they say, they might have relet at that advance. The prayer of their cross-bill is that her pretended title to the land be removed as a cloud; that she be injoined from prosecuting or harrassing them concerning it any further, and especially, that she and her attorneys be injoined from further prosecution of the Mem-

phis suit. They also pray a reference for an account, and general relief.

This answer and cross-bill was sworn to on the 15th of July, 1882; and publication made against the defendants, all of whom were residents of Tennessee. An attorney for them, *ad litem*, was appointed, and in the absence of the circuit judge from the county, an order of injunction was made as requested, by the county judge, returnable at the November term of the court. The order required no bond, and none appears to have been given before the writ, although the transcript shows that one was filed about a week afterwards, without other indorsement than the file mark of the clerk. The injunction was issued prohibiting the complainant from any further prosecution of the Tennessee suit.

We follow this writ beyond our borders, and find it was there served upon the Picketts and their attorneys by the sheriffs of Maury and Shelby counties. This was simply notice by individuals. What impression it made on the Picketts, husband and wife, we are not advised. They resided in a part of the state distant from Memphis, and remained passive. The attorneys, however, at Memphis, seem to have accepted it as notice. No formal service was necessary, and it was as efficient to bind them, if binding at all, as if it had been served upon them personally in the state of Arkansas.

Meanwhile, however, and before such service, the chancellor of the Shelby court had decided the case submitted, sustaining the jurisdiction of his court, granting the relief prayed, and holding that there should be an account. The decree had not been entered of record. It seems that in that case the attorneys were engaged in settling the form and terms of the decree to be entered, in accordance with the opinion. After the injunction was brought to their notice the attorneys for defendants objected to the entry. The honorable chancellor, out of a delicacy which we can appreciate, declined, of his own

motion, to direct the decree to be entered, but conceded the right of complainant's attorneys to have it done. They moved accordingly and it was done.

On the 18th November, 1882, the complainants in the cross-bill here, who had impetrated the writ of injunction, moved for an attachment against the Picketts and their attorneys for contempt, and it seems that it stood over without a rule to show cause. S. P. Walker, Esq., of the firm of Metcalfe & Walker, one of her attorneys in Memphis, and who was also an attorney in the Mississippi county suit, appeared in chambers on the 20th of April, 1883, and answered the motion. He set forth that the writ had not been issued when the chancellor delivered his written opinion settling all the rights of the parties, and ordering an account. That after knowledge, on his part, of the writ, he had moved that the judgment and decree of the court in accordance with the opinion, should be made of record, and that the same was done. That, although advised of the writ, he had no legal notice of it. That he attended the session of the Mississippi court during the preceding November, when he saw and examined the original papers, since which time no steps had been taken in the Memphis suit.

Further, that the Picketts, husband and wife, were residents of Tennessee, and had not been in this state from a period long before the filing of the original bill.

Further, that the cross-complainants appeared by counsel in the Memphis court and resisted the entry of the decree on account of the injunction, and upon showing of the facts upon which this motion is based; and that the court heard and overruled the objection.

Further, that the writ was void, no bond having been required by the judge, nor taken by the clerk before its issuance.

Upon hearing the motion, the chancellor, in chambers, on the 28th of April, 1883, held that in causing the decree to be entered, the Picketts and their solicitors were in contempt.

Pickett v. Ferguson, et al.

The motion to attach was sustained, but the parties were allowed to purge the contempt by filing in the Mississippi county suit, on or before the first day of the next regular term, a certified copy of an order, to be, by them, asked for and obtained from the chancery court of Shelby county, Tennessee, vacating and setting aside said decree, leaving said cause in Tennessee in the exact condition in which it was when the injunction was served; and by obeying said writ in the future, and paying the costs of the motion. It was ordered that if said contempt be not thus purged, the Picketts "will not be allowed to take any further steps in, or prosecute said cause so begun by them in said court in Mississippi county." This order was, at the next term of the court, on the 8th of May, 1883, made absolute, upon the failure to file the required certificate. Upon the hearing of the motion Mrs. Pickett had only entered a special appearance, by counsel, for the purpose of denying the right of the court to proceed, because she had no notice of the proceeding.

Mrs. Pickett prayed an appeal from the orders in contempt, original and absolute. The prayer was refused on the ground that the orders were interlocutory.

She then offered to file a plea in abatement of the cross-complaint, a copy of which plea is set forth in the transcript. It is based simply on the ground that she and her husband are non-residents, outside of the jurisdiction of the court, and had not been served with process. The complainant, Ferguson, in the cross-bill, objected on the ground that she was in contempt. The court sustained the objection and would not allow the plea to be filed, even as against Hampson, who did not join in the objection. Exceptions were taken, and an appeal prayed, which was also denied.

On the 11th of May, 1883, the Picketts offered to file a demurrer and answer to the cross-complaint. This the court refused on its own motion and for the same reason. Exceptions were taken and a prayer for an appeal refused.

13——45

In this answer Mrs. Pickett set forth the deed from her daughter and her daughter's husband, showing that she was entitled to the whole of the land. Also the decree of the Memphis chancery court, which had been rendered on the 2d of August, 1882. From this answer and exhibits it would have been shown that the substance of that decree was as follows : That the cause was heard there on the issues made between complainants, and Hanauer and Hampson, without Ferguson, as to whom the bill had been taken for confessed. The chancellor found that the purchase at the foreclosure sale had been really made by Ferguson & Hampson, the tenants of Mrs. Pickett; that the bid by Hanauer had been made for them, and that Mrs. Pickett had the right to redeem. An account was directed on the following principles; Ferguson & Hampson to be allowed:

1.  The amount paid by them on the purchase with interest.

2.  Amounts actually expended by them in taxes since the sale, depreciated scrips to be rated at cash value.

3.  The value of permanent improvements made by them after the sale, up to the time of filing the bill, not exceeding the enhanced value of the place, and exclusive of clearing and fencing.

And they were to be charged:

1.  With full five years' rent under the lease, with interest on deferred payments.

2.  With $536.33, amount of insurance money received by them for Mrs. Pickett, with interest.

The amount then found due by her, was to be paid in sixty days after the confirmation of the master's report, or, in default, that the lien be foreclosed. If paid, her redemption was to become complete, and a deed should be executed to her by Ferguson & Hampson, both as individuals and as a firm. It was directed that the lien retained by Hanauer upon the land,

in his conveyance to Ferguson & Hampson, should, as to her, be disregarded; but out of the amount paid into court he might claim what Ferguson & Hampson, might owe him for his advances in purchasing the lands. No damages were allowed for eviction, nor for any breach of her contract regarding the rebuilding of the gin, the last point being upon the grounds that she was a married woman incapable of contracting.

On the 17th of May, Mrs. Pickett moved in the Mississippi case for a continuance, with an affidavit to support it. She was not allowed to file either. The ground of the motion was the absence from the certified copy of the record in the Memphis case, of material evidence, which there had not been time to supply.

Next day she asked leave to dismiss her bill at her own costs. The court refused to allow her to do so on the ground that she was in contempt, and because the dismissal of her original bill would prejudice the rights of defendants in the cross-bill.

On the 18th of May, 1884, a final decree was rendered. The record states that Mrs. Pickett was present by attorney and that the cause was heard on original bill and exhibits, answer and exhibits, cross-bill and exhibits; and the evidence offered by defendants to the original bill, and by Ferguson, complainant in the cross-bill. The court held that there was no equity in the original bill, and that the prayer of the cross-bill by Ferguson should be granted. The first was dismissed for want of equity and the title of Ferguson in the lands "granted" against all the claims made by Mrs. Pickett and her husband. The restraining order against the Picketts was made perpetual, and all the costs were decreed against them. To this decree the Picketts excepted and prayed an appeal, which was granted.

The underlying question presented by this case regards the jurisdiction of the chancery court at Memphis. It is a very old

doctrine in equity, established long anterior to the case of *Penn v. Lord Baltimore*, that courts of chancery have jurisdiction over resident citizens of the country in which the courts sit, and those found within its limits and personally subject to their power, in order to determine, between them, rights of real estate situated in any part of the world; and to·enforce by proceedings *in personam* such conveyances as would be valid in the country in which the land may be situated. This power results from the nature of equity proceedings, which were, originally, in fact, and are still, in theory, directed wholly against the person of the litigant, compelling him to do, or to refrain from, acts,. as conscience might require.

Proceedings *in rem* in chancery are the results of subsequent growth and development, and have become common; but the original idea still obtains in determining questions of jurisdiction. The court does not assume to act directly upon property out of its reach, but may compel persons within its reach, to do acts which foreign tribunals have been used, in comity, to regard, as fixing the rights of those who are subject to the orders of the court.

Originally decrees of courts of chancery did not bind the rights of parties, even to property within the jurisdiction of the court. Only the person was coerced by process of contempt and imprisonment. In that condition of the law it is plain that the *locus* of the property was of no consequence, and the jurisdiction could not depend upon it. Later, if the decree were for land, and the person remained obstinate in prison, a mandatory injunction was issued to compel him to yield possession, and if he disobeyed that, then the court, as a last resort, issued a commission to justices of the peace to put the injured party in possession, and a writ of assistance was, if necessary, issued to the sheriff to use the *posse comitatus* for the purpose. For other demands contempt was the only remedy. Writs of sequestration to compel obedience were in-

troduced in the time of Elizabeth, but they, too, only operated *in personam*, inasmuch as the property was only detained from the owner till he should obey. Appropriations of the property sequestrated and finally writs of execution were of quite modern origin. *Spence's Eq. Ju., Vol. 1, p. 391; Daniell's Ch. Pra., p. 1032.* Notwithstanding these remedies, however, the decrees were considered so purely personal, and as so little binding on the *right* of property concerning which they were made, that they abated with the death of the person charged, and did not affect the property any further than to enable the person claiming it to come in, *pari passu*, with other creditors againt the personal estate. See *Daniell's Ch. Pr., ubi supra.*

In the growth of equity jurisprudence it has come to pass that its jurisdiction *in rem* has become so common as to almost distinguish it from courts of law by that feature alone. It now sells land and vests titles by decrees. But it is one of its familiar maxims that old jurisdictions are not lost by new and more effective remedies. The doctrine in *Penn. v. Lord Baltimore* was no new doctrine. It was, on this point, but the assertion of a familiar principle which of itself would have elicited little discussion. The real doubt there was, whether the jurisdiction was in chancery, or in the king in council.

It is clear that the Tennessee chancery court had jurisdiction over all the parties before it, to declare any of them trustees of the land, whether situated in Tennessee, Arkansas, or the ends of the world, and to adjust accounts between them and determine fiduciary relations. This would be conclusive as to Mrs. Pickett, Hanauer and Hampson, if they were all the parties. We are led, then, to consider whether the jurisdiction extended to Ferguson, and if not, whether that defeated the jurisdiction as to the others.

If Ferguson were, at the time, a citizen of Tennessee, I think it will be conceded that he could not deprive that state of the power, by apt regulations regarding notice and procedure,

to hold him subject to the jurisdiction of the courts, at least so far as that might be done by sequestration. A state's jurisdiction over its own citizens would be of little worth, if any one of them, being a co-defendant with others, could deprive the court of jurisdiction as to all, by eluding personal service at the commencement of the suit. It is very old chancery practice to entertain jurisdiction of a suit in the absence of a party not served at the beginning, and even to proceed with leave to the absent party to come in at any time, or with the chance of obtaining service during the progress of the suit. *Daniell's Ch. Pr., p. 149, et seq.*, where numerous cases are collected in the notes of Cooper's edition. The approved practice in such cases is, that if it should appear that a fitting decree cannot be pronounced as to the parties before the court, saving the rights of those not served, the court will decline to proceed until all be brought in. (*Ubi supra.*) But it would seem plain that the court in which the suit is brought must determine that, as well as the *fact* of non-residence. Any error in the decision of the court would be subject to correction by the proper appellate court of the same sovereignty—certainly not by a foreign tribunal.

In the close business connection which exists between resident citizens of different states in America, resulting from the equality of their rights under the constitution, the close contiguity of their boundaries, the facilities of intercourse, the increasing tendency to vast combinations of capital, and the formation of companies controlling and owning real estate in many states, it would be attended with shocking inconvenience to apply strictly as a *jurisdictional* question, the old rule, if it ever existed, that courts cannot entertain a cause in which some of the defendants may be residents of another government, or not served in their own. Even in England, upon the same grounds, which operate there with less force, it has been found necessary to relax the rule, and to proceed even to a decree, where

the interests of those who are absent may be considered as fairly *represented* by those before the court. It was only on this ground of necessity, indeed, that bills against classes were entertained at first. Of course, it is not contended that such decrees would be binding upon those not parties, simply on the ground of similarity of interest. They are left to assert their rights in other appropriate modes.

This is well expressed by Lord Langdale, master of the rolls, in the case of *Powell v. Wright, 7 Beav., 444.* After stating the general rules "not to dispose of any matter, not to bind any man's interest, or make any declarations of any man's right, in his absence," he says: " The complication of human affairs has, however, become such that it is impossible always to act strictly on this general rule. Cases arise, in which, if you hold it necessary to bring before the court every person having an interest in the question, the suit could never be brought to a conclusion. The consequence would be that, if the court adhered to the strict rule, there would in many cases be a denial of justice. This has induced the courts to sanction a relaxation of the rule. And accordingly they have said, if we can be satisfied that we have before the court, persons whose interests are the same as the interests of those who are absent, we will be content to hear the cause upon the argument of such persons; and if we are *then* satisfied that the case has been fairly and honestly presented, we will order the distribution of the fund on the representation of the persons present. Though the court will thus make a distribution, I have never heard," adds the master, "that the proceedings in the suit are to all intents binding on the absent parties. So far as I know, it has never declared that the absent parties are to be cut off from all chance of correcting an error, which, in consequence of their absence, may have been made to their prejudice. The courts in these cases are always running the risk of doing what may be prejudicial to the absent parties."

Here is a rational practice, clearly stated, and carefully guarded with qualifications. It needs no explanation. It is an advance, it must be confessed, but evidently one to which the courts must be driven, by changes in business and the development of complicated industries. If I understand the master of the rolls, he means simply to assert that courts of equity have jurisdiction to entertain and hear causes, in which some parties otherwise necessary cannot be reached, and to pronounce a decree, if they should at the hearing deem it safe and equitable to do so, which, however, will not be binding on those who are absent, provided they take steps to set it aside, or to assert their rights in some appropriate mode.

The case of *Willatts v. Busby, 5 Beav., 193,* is similar to this and point blank. That was a bill for specific performance —to obtain title to land by carrying out the terms of a contract. One of the parties owning the land was without the jurisdiction. He was an essential party, and it was contended that the court could not proceed with the cause. It was held otherwise and a specific performance decreed, with leave to the absent party to come in and execute the decree, or if he should not, then the decree as to him to be without prejudice.

In the federal courts of the United States it is the general rule to dispense with all parties over whom the court would not have jurisdiction, when it can be possibly done, consistently with the merits of the case. This rule springs from the same necessity, and tends to the same object by a different method. In those courts the citizenship of parties *is* jurisdictional under the constitution, and there is no room to bring them in or to allow them to come in, if they be not such parties as the courts could bring in without loss of jurisdiction over the whole case. The court must decide between the parties over whom it has jurisdiction, or be ousted of jurisdiction by attempting to bring in all. Hence, it will dispense with parties as far as possible. The English and state courts are under no such

restrictions, and may retain causes in the absence of necessary parties to allow them to come in, or may make such determination of the rights of parties actually before them as may be possible. I think the weight of authority, heretofore, has been that a court ought not to make a decree at all in the absence of a party whose rights are so involved that a complete decree cannot possibly be made as to others without him, but that is matter of judicial determination, and the proceedings in the cause cannot, in comity, be regarded by the courts of other states as nullities on account of the absence of a party.

We do not think it useful to multiply authorities to show that the chancery court of Tennessee was, at the time of the filing of the Arkansas bill, exercising a jurisdiction as to the accounts between Mrs. Pickett and the firm of Ferguson & Hampson, and as to the questions of trust resulting from those transactions, as called for such recognition on the part of our court as the rule of comity required in other cases of suits pending abroad. All the members of the firm were well represented by Hampson.

The facts were that up to within a few days before filing the bill in Memphis *all* the parties were residents of Tennessee. Ferguson had so testified deliberately on oath, as to himself, during a trial at law which Mrs. Pickett had dismissed for the purpose of filing the bill. The firm was a Tennessee firm, with its office there. The whole transactions between Mrs. Pickett and the firm had occurred there. Most of the witnesses resided there, or at points easily accessible. In every respect, save as to the control of the land, (which it was not necessary to have in order to declare a trust of it in the firm, and to compel the firm through its members to execute it,) Memphis was the most convenient tribunal for the litigation. It was brought to the notice of the court on the hearing that Ferguson, after the dismissal of the lawsuit, and before the filing of the bill, was advised to leave the state, and did so with the intention of de-

priving the Tennessee courts of their jurisdiction in the matter. It is very clear that he knew of the whole proceeding from the beginning, eluded service, and left the matter to be litigated for both by Hampson and Hanauer. The question of jurisdiction was reserved and submitted with the other questions on final hearing, in Tennessee. The court was entitled to determine, under the laws of Tennessee, whether or not Ferguson was a citizen and subject to its jurisdiction, under such laws as every state has the right to prescribe for its citizens, in chancery proceedings especially, or, finding him no citizen, had the right to determine how far it would proceed without him. It is not for our courts to anticipate any error in its decision, or to correct it if made. Comity requires that we recognize a valid *lis pendens* with regard to the subject matter of this suit, when the complainant filed her bill here. (See *Sto. Eq. Jurisprudence, Sec. 78' and notes*, especially with reference to an absent partner.)

If then, Ferguson was in fact a resident of Arkansas at the filing of the Tennessee bill, it would not necessarily follow that, as a partner, he could not have been made in any mode amenable to the laws of the state, or the orders of the court, without personal service. The states have, undoubtedly, jurisdiction over property within their limits, and might authorize the courts to enforce their orders and decrees against partnerships by sequestration of partnership effects, especially in a case where a partner had withdrawn from the country with the manifest design of eluding service. We do not judicially know in this case what the laws of Tennessee may be, nor is it necessary that we should. It is enough to know that at present the courts of that state are considering the question of their own powers, or were when the matter was first presented to a court in Arkansas, and we are not yet advised of the ultimate result in her court of appeals. That state has first possession of the case. Comity requires that we should await her action, or at

least defer further proceedings until a reasonable time should have elapsed for the prosecution of the suit there to a final determination of the question. This would also be proper if Ferguson were truly a non-resident. The powers of chancellors to restain the action of absentees or non-residents, by sequestration of property they can reach, are commonly exercised in England. In America this power has also been conferred in some states by statutes, which, so far as we know, have never been held liable to constitutional objection. It was done in New York in chancery proceedings for a long period before their code.

The statute pointed out the mode by which a non-resident defendant might be summoned to appear by publication. Upon that a decree might pass against him, and performance might be compelled by sequestration of his real and personal property, or by causing delivery of specific property where that relief was sought. It was not confined to proceedings *in rem*, but included cases requiring the payment of money as well.

The Tennessee court having thus obtained jurisdiction of the controversy, we see nothing in principle to prevent Mrs. Pickett from filing such a bill here as would restrain the alienation of the property *pendente lite*. The mere pendency of the suit in Tennessee would not have done so. She had the right to ask that, until the matter should be determined there, in order that there should be no further complication of the title. Her bill is somewhat unprecedented as to its form and prayer, but well founded on principles of justice. It is both ancillary and alternative. Perhaps under the general prayer she may be entitled to relief of appropriate sort. Be that as it may, the defendants are precluded now from objecting to it. It evidently offered the opportunity desired. It was not demurred to, but answered readily, and made the grounds of catching and impaling her here, and enjoining the proceedings in Tennessee. She was not allowed even to dismiss it, because that

would prejudice, as the court supposed, their rights under the cross-bill. It certainly would, if they had any right to file a cross-bill at all. Her bill made the only cloud upon title of the defendants that they alleged, and that does not seem to be a cloud enabling them to invoke the aid of chancery to remove. The defendants have the perfect claim of legal title. Mrs. Pickett has no instrument that can cloud it, or make it doubtful. It is her title that is clouded, if she has any, and she must herself maintain it by parol testimony to make out her equity. A successful defense to her bill would have accomplished all the purposes of defendants save the injunction. The cross-bill was for that alone. The quieting of title was put in *pro forma*.

The injunction issued by the order of the county judge was certainly ill advised. A striking feature of its improvidence was, that in the face of the statute, and the magnitude of the interests involved in the Tennessee suit, no bond was required. This was certainly erroneous. The county judge could not know that the injunction would be certainly sustained, or that no damages could be adjudged on its dissolution. Besides, it, in effect, attempted to interfere with the adjudication of a case already submitted, and, as we have concluded, properly submitted, to a foreign court. The time to enjoin parties, irrespective of the court, had passed. The attorneys and the parties had done all they had to do. It was beyond their power to object to any decision by the court, save for error. It remained alone to the court to pronounce its decision and direct the decree. Unless a court may be enjoined, it would be as hopeless to attempt to enjoin the decree as to arrest a shaft which had been sped from a bow.

A suit after submission will not abate by the death of a party, so as to make a revivor necessary to a decree. This is the practice of our court. The entry of the decree is clerical,

and may be made, at any time, of the date upon which it was ordered. From that date it takes effect.

This was ruled more than two hundred years ago, in the time of Lord Nottingham, in the case of *Clapham, et al,, v. Phillips, et al., Finch, 169.* The question there was whether a decree made in the lifetime of Lady Clapham could be enrolled after her death, or whether the suit abated. The lord keeper declared that " the decrees of this court ought to take effect from the time the judgment of the court was given and the decree *pronounced* in the cause, and that the death of the parties ought not to hinder the enrollment thereof in some convenient time." An order to stay the enrollment was therefore discharged.

An enrollment of a decree under the former English practice was simply such formal entry of it in full form upon the record as to make it final. It answers in our practice to a record of the decree approved and signed by the judge. What is called an *entry* of it is a draft prepared by the registrar and deposited with the clerk of entries. The decree itself, however, as appears from the above case, takes effect from the time it is pronounced. Orders to make such entries *nunc pro tunc* are sometimes made after long intervals. The point here is, that at the time this injunction was ordered the cause had been argued and submitted, and before knowledge of it was brought home to the parties the cause was decided. Under the circumstances the injunction was not provident. It could not arrest either the decree or its record, without operating on the court itself. It is the duty of a chancellor, of his own motion, to take care that all judgments of his court be properly entered.

Although no one can claim it as his right to be sued in the courts of his domicile, in cases where foreign tribunals may have concurrent jurisdiction, (*28 Vt., p. 470,*) yet courts of chancery freely exercise the right to restrain parties before them from *beginning* suits in other courts. As to this there is

no question.    And the cases seem numerous also in which courts of chancery, when they can do so by operating on the parties alone, restrain the further prosecution of suits already commenced abroad.    It is a question of prudence rather than one of power.    The cases seem to indicate that it ought not to be done save for manifest purposes of justice—under a sort of pressure of necessity.    Some decisions go to the extent that it ought not to be done at all.    The courts of New York have persistently refused to do so.    The leading case there is *Mead v. Merritt, 2 Paige, 402*, in which Chancellor Walworth very forcibly forecasts the evils and dangers of the practice.    He says: "Although this court has the physical power to act coercingly on the parties within its jurisdiction, it has frequently decided that it would not sustain an injunction bill to restrain a suit or proceeding, previously commenced, in the court of a sister state." He remarks that he is not aware that any court of equity has ever deliberately decided that it will exercise that power, and proceeds:    "Not only comity, but public policy, forbids the exercise of such a power.    If this court should sustain an injunction bill to restrain proceedings, previously commenced, in a sister state, *the court of that state might retaliate upon the complainant, who was defendant in the suit there, and by process of attachment might compel him to relinquish the suit subsequently commenced here.*    By this course of proceeding, the courts of different states would indirectly be brought into collision with each other, in regard to jurisdiction, and the rights of suitors might be lost sight of in a useless struggle for what might be considered the legitimate powers and rights of the courts."

If that distinguished jurist could have lifted the veil of the future and foreseen this case, he could not have described it more accurately in every feature, even to the losing sight of the rights of at least one of the parties, in a struggle to compel her to abandon the Memphis tribunal ; a struggle, too, which led to no definite results, leaving confusion worse confounded ;

and the courts of sister states, divided only by the Mississppi, in direct collision with regard to the rights of the same parties, with regard to the same subject matter.

That case was followed in *Brickrell v. Field, 8 Paige, 440,* and in *Burgess v. Smith, 2 Barbour, 276,* both by the same chancellor, at long intervals. The same cautious policy was announced in Vermont in the case of *Bank of B. Falls v. R. & R. R. Co., 28 Vt., 470,* and it is now the settled policy in Illinois, as was broadly announced in the case of *Harris v. Pullman, 84 Ill.; (S. C. 20 Am. Repts., Vol. 25, p. 416.)* The court, conceding its power to issue such injunction, and that it had been done in England, says, upon the authority of the New York case, that " it has been held, in this country, that after suits are commenced in one of the states it is inconsistent with inter-state harmony that their prosecution should be controlled by the courts of another state."

There is no conceivable reason why the Tennessee chancery court should not hear and determine matters in controversy in the suit then pending. Not the slightest purpose of convenience, even, made it desirable to transfer the litigation to Arkansas.

It was a suit against a Tennessee firm by Tennesseeans. All were served there save Ferguson, one of the members of the firm, who knew of the nature of the suit, might have made his defense there, and actually was fully represented, as to his interests, by Hampson. We cannot presume that the chancery court of a sister state would be less competent, or less inclined, to do him justice than one of his own. That one prefers to have his rights adjudicated by a court of his own state is no ground for an injunction, as stated above, and the *locus* of the property, in the view of a court of equity, was a matter of entire indifference. There was no necessity, nor, it seems to us, any propriety in enjoining the Tennessee suit. If the de-

fendants were annoyed by two suits, the objection should have been urged against the suit in Arkansas.

Another consideration presents itself, attended with very grave doubts—that is, the jurisdiction of the Arkansas court to enjoin the conduct of the plaintiffs in Tennessee, and to hold them in contempt, on disobedience with regard to matters outside the state. It is not certain that a non-resident plaintiff, suing in a civil action, really places his person under the control of the court for all purposes, or for other purposes than the prosecution of the suit. Perhaps restraints put upon him, or restrictions, or elections, prescribed as terms upon which he may be allowed to prosecute, may be the proper limit of authority. But it is not necessary to decide this. The injunction was palpably improvident and erroneous.

The county judges are not learned in the law, and their mistakes are to be regarded with leniency and tolerance. They may be supposed to do honestly the best they can. Our constitution, clothing them with this power outside of their range of study and experience, has supposed it to be a lesser evil that improvident injunctions should at times be issued, than that this remedy should fail from the absence of the circuit judge when it might be of the highest importance. But it is the duty of the chancellors to dissolve them when improvident, upon the first opportunity. To make this injunction perpetual, as was eventually done, was error.

Nevertheless, improvident as it may have been, it was the duty of all parties having notice, to obey it. Disobedience of an erroneous injunction is a defiance of the authority of the court and involves contempt. Whoever disobeys, does so on peril of punishment. To move for the entry of the decree in the Memphis court, and to insist upon it in express defiance of the injunction, under the intimation of the chancellor that he would himself so far respect the action of our county judge as to defer the entry if it were not pressed as a right, was in spirit

Pickett v. Ferguson, et al.

·a contempt.  The chancellor in Tennessee went as far as we could ask in comity.  If his course had been taken it would have allowed time for the parties enjoined to have sought some· superior judge in Arkansas, and to have had the injunction dissolved.  Our constitution, which authorizes a county judge to issue an injunction in vacation, in the absence of the circuit judge, provides also that it may be reviewed by any superior judge in vacation.  This is the proper course to be pursued in case of an improvident injunction.

Nevertheless, it is the acknowledged and constant rule, in case of contempt of an improvident injunction, to punish as slightly as may consist with the dignity of the court and the preservation of that respect to the judicial tribunals which is essential to the maintenance of civil government.  The chan- cellor did not err in holding the complainants amenable to punishment for contempt, for disobedience through the conduct of their attorney, which they did not disavow.  This brings us to consider the propriety of the punishment inflicted in consequence.

It was ordered that Mrs. Pickett purge the contempt before the next term of the court, by causing the decree of the Ten- nessee chancery court to be set aside and by satisfying the Arkansas court that she had done so, or that in default she be prohibited from taking any farther steps under the bill of complaint.

This was but widening the error committed in issuing the injunction, and starting upon a course, which, if followed con- sistently, must lead, as it did, to the gravest complications and invasions of right.  It required what might be an impossibility, and was at best an improper attempt to interfere with and give direction to the proceedings of a foreign tribunal.  She could not have set aside the decree as a matter of course on motion. It required the deliberate judgment of the court itself.  The Arkansas chancellor should have considered the injunction, and

finding it improvident, should have inflicted only slightly pun-
ishment, and dissolved it.   The costs of the proceedings in
contempt, put upon the attorneys, with perhaps a slight fine,
would have amply vindicated the court, and that should have
been sufficient.   There was no reason in continuing an
improper injunction because it had been disobeyed.   That only
served to inflame and aggravate the consequences of a step in
the false direction, which if corrected at once would have been
attended with little harm.

As might have been foreseen a still graver error supervened
at once, upon the continuation and approval of the original in-
junction.   The complainant was held to remain in contempt,
and consequences were attached to that status, which were
utterly destructive of all her rights as a party to the suit.
The penalty prescribed beforehand was that she would not be
allowed to take steps in prosecution of her bill.   The conse-
quences affixed by the court to her contempt were, that she
should neither prosecute nor dismiss her bill, that she could
neither plead to the cross-bill nor answer it, nor have a con-
tinuance for testimony.   She was forced to a trial upon her
own bill, and the answer to it, and the cross-bill unanswered,
and therefore by the rules of pleading taken as confessed; and
the cause was heard on the *ex parte* testimony of complainants
in the cross-bill.   She was not allowed to go out, nor to go on,
nor to raise her voice in defense.   She was utterly paralyzed,
and was met at every turn by the stern, inflexible response of
the court, to this effect:   " You are in contempt and hopelessly
so.   You need move for nothing."

We must examine very seriously into this practice, before
we can affirm anything done in pursuance of it.   It will not do
to say that taking the case altogether, by its four corners, she
was not injured in the end, and we will not trouble the courts
to go over it.   It will not do to say that she did not need to
introduce any evidence, nor to have a continuance for the pur-

pose, nor to plead, nor to answer, because the defendants were pleased to furnish some evidence themselves in her favor, and we see nothing in all of it that preponderates over the chancellor's conclusions. It will be a sad day for our jurisprudence when suitors *for any cause* may be made to stand in that attitude before the courts, and have their civil rights determined, and not to be heard by this court to complain.

We have adopted our equity jurisprudence and practice from England, as it prevailed there early in the present century, upon the passage of an early act of the Territory of Louisiana, so far as it can be accommodated to our circumstances, and the organization of our courts. This I take to be the meaning of the act of October 26, 1810, which declares that "in all cases where a remedy cannot be had in the ordinary course of the common law proceedings the general court shall exercise chancery jurisdiction." The civil law had prevailed in Louisiana, and there was no source to which to look for principles of chancery jurisdiction and the general practice of the courts but England. Some provisions for practice followed, adapted to the territorial courts. Additions were made to the act by the laws of the Missouri Territory on the 22d of January, 1816, and again by the action of the Arkansas territorial legislature on the 22d of October, 1828, and the 7th of November, 1831. Thence the system passed into the state organization, with few changes, until the adoption of the civil code in 1868, since which time proceedings in equity have been maintained as a separate branch of our judicature. In the absence of statutory regulations then, we must look to the English practice for our precedents, aided by the views of those American courts which have drawn their equity jurisprudence from the same great treasury.

By the English practice, contempts, for disobedience of an order, were only punishable by imprisonment until the order should be obeyed, and that without limit. It was a simple

matter of physical endurance on the part of the recusant. At a later period sequestration was also applied in cases of con-tinued contumacy; which was a process by which the lands, goods and chattels of the contemnor were seized and held from him until he should obey, or purge his contempt. These were not adopted strictly as punishments, but modes of coercion to obedience. They closed with it. (*Danls. Ch. Pr. & Pl., p. 1042 et seq.*) This with regard to matters where obedience was the object. For wilful contempts of a penal character, where the object was punishment, commitment at the discretion of the chancellor was adopted, (*Ib., 1069,*) which in modern practice has been changed to fine, with imprisonment until the fine be paid. The last is proper punishment for violation of an in-junction. *High on Inj., Sec. 1057, 2 ed.*

Some consequences were attached to the condition of con-tempt, committed by a party in a suit. He was in court as it were *in vinculis.* The general rule upon this subject was that a party in contempt must clear it before he could be heard. It is so broadly expressed in *Vowels v. Young, 9 Vesey, 172,* but that was on a motion for rehearing, which was an application for favor. There are American cases in which this rule seems at first to have been applied to prevent the defendant from contradicting any of the allegations of the bill, or bringing forward any defense, or alleging any new fact. A critical ex-amination of some of them, however, discloses that these broad expressions were made, as in the case in *Vesey,* in cases where the application was made to favor.

Be that as it may, I think the qualification of the English rule is well established there by reason, and the current of authorities in both countries. Ld. Ch. Baron Gilbert, quoted by *Mr. Daniells, p. 505 of Pl. and Pra.,* said that as a general rule, " the contemnor, who is in contempt, is never to be heard, by motion or otherwise, till he has cleared his contempt or paid the costs; *as for example, if he comes to move for anything, or*

*desires any favor of the court."* The example discloses the true qualification of the rule, and its purpose. This is to bring the party to terms with regard to conduct in the suit, when he may comply and thus get the right to be heard in all motions. Meanwhile he will not be heard in asking any favor, where the consent of the court may be necessary. So far as I have examined the cases in detail this distinction runs through all of them. As Mr. Daniell says on p. 505: "The rule that a party in contempt cannot move till he has cleared his contempt is, *in practice,* confined to cases where such party comes forward voluntarily and asks for an indulgence."

It did not apply to matters of strict right, and therefore it was held in *7 Simmons, 200, Ricketts v. Mornington,* that a defendant could not object to a cause being heard because the plaintiff was in contempt. In *Wilson v. Bates,* 3 *Mylne & Craig, 197,* a plaintiff in contempt was allowed to sue out an attachment against defendants for not answering the bill. Lord Cottenham, chancellor in that case, discussed the meaning of, and practice under, the 78th ordinance of Lord Bacon, which reads that "they that are in contempt, especially so far as proclamation of rebellion, are not to be heard, neither in that suit nor any other, except the court, of special grace, suspend the contempt." *Beame's Orders, 35.* He remarked that it was obvious that the rule, if strictly and literally acted on, would be contrary to the established practice of the court, saying, for instance, that it would be extraordinary, if a party who had not been able to pay the costs of a refused motion (and therefore in contempt) should be thereafter absolutely stopped from asserting his rights. Also, that the practice of hearing a motion by a party to get rid of a contempt, was against the letter of the rule. He says too, that it is "well settled, that if a party in contempt is brought into court by any proceedings taken against him, he has a right to be heard in his defense, and in opposition to these proceedings," He repudiates the idea that

a party in contempt cannot proceed in the cause, citing *Ricketts v. Mornington, supra.* In the case, *King v. Bryant, Ib., p. 191,* Lord Cottenham remarked that "it would be a *most unjust extension* of the rule against parties in contempt to take away a man's estate without giving him an opportunity of coming in and defending himself," and further, which shows the distinction of cases, he says "the court will not hear a party in contempt, coming himself into court to take any advantage of proceedings in the cause; but such a party is entitled to appear notwithstanding, and resist any proceedings taken against him." Without citation of other English cases, or further remarks to show how those which, from the generality of the language used seem to be *per contra,* may still be discriminated, it is sufficient to say that the English practice, as conceived and expressed by Lord Cottenham, has prevailed there to the present time, and that the good sense of Lord Bacon's successors has done his memory the justice to make no absurd extension of his rule to all cases within its letter. In the case of *Haldone v. Eckford, L. R. Eq., Vol. 7., p. 425,* decided in 1869, which was, as the vice-chancellor remarked, a contempt of the most flagrant kind, committed in disobedience to the order of court, it was nevertheless held that he was entitled to take "any steps required for the purposes of his defense."

In America the cases have been somewhat conflicting, confused and indeterminate of any fixed, clear-cut rule. In New York the English practice is adopted, that the court will not grant to a party in contempt any application, which is not matter of strict right, but the courts decline to punish contempts by depriving the parties of the strict right of pleading. See cases, *Johnson and others v. Pinney, 1 Paige, 647,* where the rule was applied to deny a favor, Chancellor Walworth remarking that he did not intend to be understood as applying this principle to an application which is a matter of strict right. The favor there asked by the contemnor was a commission, after

the proofs had closed, to take the deposition of an absent witness.

In *Ellingwood v. Stephenson, 4 Sand., 369,* a party in contempt applied to open a decree rendered against him by default. Vice Chancellor Sanford denied the motion, on the express ground that it depended on favor. These cases were followed in the court of appeals in 1871, all the seven justices concurring when the rule was stated and approved, as applying *only* to matters of favor, and that, though adjudged to be in contempt, the party will be heard on matters of strict right.

The New York equity jurisprudence, as ours, was imported bodily from England, and had the happy fortune to fall into the hands of separate chancery tribunals, over which those great lights of jurisprudence, Kent and Walworth, successively presided. I think that in all cases not governed by New York statutes, the old chancery decisions of that state, such as we find them in *Johnson* and *Paige,* are safe indications of the true English practice. We think it ought to prevail here, upon reason and the better precedents. We have statutes regarding contempts, but, as applicable to violations of injunctions, I lay little stress upon them. The provisions for punishing contempts are plainly inadequate to such cases. Besides, by what seems a plain implication from the constitution, the general assembly has no power to regulate the punishment for contempts committed by disobedience of process.

The supreme court of Rhode Island seems in one case to have been very much perplexed over the very question here presented, and declined to decide it at all. *Hazard v. Durant, 11 R. I., 195.* A defendant, who had violated an injunction, had been held in contempt, and ordered to give a certain bond in order to purge the contempt, and had been unable to do so. He then applied, notwithstanding the contempt, to be allowed to appear and defend by demurrer, plea, answer and proofs, but citing no precedent in support of the request. The court said

it was *not prepared* to grant it, but, under the peculiar circumstances, was, upon the other hand, unwilling to abandon the suit to the plaintiffs. It said that it was a question which arose, but which it declined then to decide, whether it ought *in every event* to enter a decree against him without first referring the case to a master to ascertain the truth of the allegations, "so that our minds and consciences may be satisfied upon the point." No decision on this question was made, the matter being laid over for taking the views of counsel, and we hear of it no more in the reports. The case is not authority either way, but is curious, as illustrating the embarrassment resulting from what we are constrained to think a hasty adoption of the old rule as to the result of contempt, according to its rigid letter; and finding its application attended with a shock to all principles of natural justice, and followed by consequences which the court shrunk from admitting. With deference to that court, the suggestion will arise, that a reference to a master would go but little way to satisfy their consciences if the defendant were not allowed to attend and introduce proof, or contest that of his adversary; and he could do nothing more if issues were allowed by answer to be tried in the usual course of proceedings. The true English practice leads to no such embarrassment.

For reasons too obvious to justify time and space for explanation, the case of *Casteel v. Casteel, in 38 Ark., 477,* has no application to sanction the practice pursued in this cause. That was a case for divorce by a husband, to which the wife filed a cross-bill upon her own part for divorce and alimony. He was in contempt for refusing to obey an order requiring him to pay alimony *pendente lite,* and that he should not further prosecute his suit until alimony be paid. This was a sound exercise of discretion—a wise condition. Humanity required that he should not leave her helpless and without the means of paying attorneys, until he could accomplish his object. She

Pickett v. Ferguson, et al.

was entitled to stand upon her innocence until the allegations should be proved, and entitled to means to defend. The bill was properly dismissed and he declined to answer her cross-bill. The proof on her part, *required by statute*, was then taken and the divorce granted. The case is an authority, indeed, in support of the practice which we have intimated as correct, and is moreover in point. This court said that, although in contempt, he might have answered and made an issue, on the cross-bill, and that the court below might have permitted him on the trial to cross-examine witnesses and produce counter testimony. That case establishes the doctrine in this state that although a bill may be dismissed for contempt in disobeying proper orders, made as conditions of its prosecution, it will in no manner affect the right of complainant to make a full defense to a cross-bill filed in the same suit. We think the court below erred in refusing appellants leave to file a plea in abatement to the cross-bill, and in refusing leave to file an answer, and in declining to entertain and consider upon its merits the application for a continuance.

We think the decree in this case was one not proper to be made. It is vague in its terms and settles nothing effectually as to the rights of the contending parties. New suits must necessarily spring out of it if it stands. It appears that the Tennessee chancery court after the complainants had been enjoined there, retaliated by enjoining the complainants in the cross-bill here from any further proceedings. This conflict of jurisdiction we may, at least, say, is much to be regretted, but we respectfully leave it to the appellate and supervising court of our sister state, to say whether the action of its chancellor was authorized or provident. Its effect here was, that Hampson, who was in the power of the Tennessee tribunal, obeyed it, and Ferguson, who was not, disregarded it. He brought on the trial and it was heard, not only *ex parte*, but it would seem upon his behalf alone, Mrs. Pickett and her husband standing

*in vinculis*, forbidden to leave the court, and with their hands bound defenseless. It was an inevitable consequence that all her rights were swept away by the dismissal of her bill for want of equity, which was quite a different thing from dismissing it for contempt. For the rest, Hampson was not recognized in that decree at all, of which he does not complain. It was held that the prayer of the cross-bill made *by Ferguson* should be granted, and that the title of Ferguson in the lands should be " granted " against all the claims made by the Picketts, husband and wife.

It was conceded on all sides throughout, that the title was in Ferguson & Hampson, and had been since their purchase from Hanauer. The proof tends to show that it was partnership property. The bill only sought to clothe them with a constructive trust, *in invitum*, and to be allowed to redeem. Literally taken, the decree vests all the lands in Ferguson, discharged of the trust claimed by Mrs. Pickett, without prejudice to the claims of Hampson, and we cannot presume that anything else was intended, whilst Mrs. Pickett's claims for rent for one year, one month and twenty-eight days, and all her insurance money, elude her grasp. What will be the effect of this decree if the Tennessee decree be affirmed, and Mrs. Pickett, trusting to the decision of her own courts, should redeem through Hampson, representing the firm, having her rents and insurance money allowed against him and the firm? This decree as to Hampson does not settle her claim for these sums, but seems to leave his individual liability in *statu quo*. There are other obvious ways in which future litigation may come, and future unseemly conflicts of jurisdiction. It is very desirable that they should be avoided. The federal government has appreciated that from the beginning, and in all the questions arising between her own courts and those of the states has acted with a delicate forbearance and wise caution,

which the states should emulate in their dealings with the tribunals of each other.

If the proceedings in this case were, in other respects, unobjectionable, we think no decree should have been entered at all of a final nature, until the Tennessee courts should have finally determined the matters over which they claimed ·and were exercising jurisdiction, or until a reasonable time had been allowed for the prosecution of the suit there by due diligence, to the court of last resort. No decree would in any case be binding on the property here, nor perhaps upon Ferguson, if he should be deemed a non-resident of Tennessee, not served. Still our courts would have the right to extend to the courts of Tennessee that recognition of their action which is usually accorded by comity of civilized nations, and might, being well advised, mould such a decree here, in accordance with that comity, as would dispose of the whole controversy and set it at rest. I have declined to enter upon the merits of the controversy at all. · I may say, however, that if I should do so, I would have no hesitancy in concurring with so much of the opinion of the court as announces that the mere relation of landlord and tenant does not of itself preclude the tenant in law or equity from purchasing the landlord's title, either from himself, or at a sale under execution or decree. I think that position sustained by a very great preponderance of judicial decisions, and that it is virtually settled in this state. If Ferguson & Hampson are to be affected with a trust, it must spring from their *conduct* as tenants, in withholding rents, and in other matters, and not from the dry fact of the tenancy. As to that I here indicate no opinion.

For error of the chancellor below, in continuing the improvident injunction; in refusing to allow the appellants to plead to or answer to the cross-bill; in refusing to entertain and determine upon its merits their application for a continuance; in placing her out of position to introduce evidence; and in ren-

dering a decree prematurely; the cause should be reversed as to the final decree, and all the orders above indicated, and the cause should be remanded, with directions to dissolve the interlocutory injunction issued upon the order of the county judge as improvident, after imposing such punishment for its violation whilst in force as the court may deem appropriate; and to place the case upon the docket in the same condition in which it was at the time the first error above noted was committed, with leave to appellants to plead, answer or demur to the cross-bill, or take any other steps necessary to the prosecution of their complaint, or the defense of the cross-bill; and with further directions that the chancellor retain the cause without final decree, until the suit in the Tennessee chancery court may be determined in the supreme court of that state, if an appeal be prosecuted, or until a reasonable time may have elapsed for such prosecution with due diligence, in either court; or until advised that such prosecution will not be made; and that upon being advised of final proceedings in Tennessee the chancellor then proceed to render such decree as justice and equity may require, for a final adjustment of all the matters in controversy.

After the Tennessee courts may have disposed of the matters over which they first obtained jurisdiction, and may have bound all persons and property and effects they have the right to bind, it would not be difficult to mould a decree here in a spirit of inter-state judicial comity, which would sufficiently protect Ferguson, without injustice to the Picketts, or Hampson or Hanauer, who may have obeyed the decree of their own courts. I do not think the decision of the court just rendered does that, or that it makes any material or satisfactory advance towards a final adjustment of the matters in controversy. There is reason to apprehend that the ghost will rise again to plague us.