J. B. WILSON *v.* JOAN RODGERS ET AL

5-5415                                        468 S. W. 2d 739

Opinion delivered April 5, 1971
[Rehearing granted June 21, 1971.]

*Milton G. Robinson,* for appellant.

*John W. Moncrief,* for appellees.

J. FRED JONES, Justice. This is an appeal by J. B. Wilson from an adverse decree of the Arkansas County Chancery Court, Northern Division, in a case wherein J. B. contended that he is the owner of a one-half undivided interest in certain real property in Arkansas County, the legal title of which was held in the name of his brother, George, who is now deceased.

Until George Wilson's death, he and J. B. were partners in livestock and farming operations on the land involved in this case. The litigation arose when the widow and heirs of George Wilson filed a petition in chancery for the appointment of a receiver and for an accounting of the partnership assets, consisting primarily of cattle and hogs. They also alleged that J. B. was slandering George's title to the land, consisting of some 670 acres, by claiming that he owned an interest in the land. J. B. Wilson filed a general denial and alleged rightful possession and control of the partnership assets. He filed a cross-complaint against the widow, Mrs. Kathryn Wilson, as well as against Joan Rodgers, Nancy Tullos, and Kalynn Harris, the three married daughters and surviving heirs of George Wilson, in which he alleged that the lands were partnership assets; that the legal titles to such lands as were held in the name of George Wilson were held in trust for the partnership; that he, J. B. Wilson, owned a one-half undivided equitable interest in the lands and he prayed for a decree to that effect. The chancellor confirmed title to the lands in the estate of George Wilson subject to

the rights of dower and to outstanding mortgages and deeds of trust. On appeal to this court J. B. relies on the following points for reversal:

"The findings and decree of the lower court are not supported by the evidence.

It was error to refuse to strike the answer to defendant's counterclaim, which answer was not timely filed; and refuse to grant counterclaimant a judgment in accordance with the prayers of the counterclaim.

The lower court erred in ruling that the Dead Mans Statute applied and in not permitting appellant to testify about conversations and transactions between him and his deceased brother, because the controversy over the land did not involve the deceased partner's estate.

It was error to permit appellees' witnesses to testify about self-serving declarations made by the deceased partner."

J. B. Wilson alleges a constructive trust in the lands as distinguished from an express trust. He contends that all the property was purchased with partnership funds, and that a constructive, or resulting trust, was created by operation of law. The burden of impressing a constructive trust on the real property in this case rested on the appellant, J. B. Wilson, and he attempted to do so by parol evidence.

Of course, a constructive trust may be proved by parol, but parol evidence for that purpose is received with great caution, and the courts uniformly require the evidence to establish such trusts to be clear and satisfactory. Sometimes it is expressed that the "evidence offered for this purpose must be of so positive a character as to leave no doubt of the fact," and sometimes it is expressed as requiring the evidence to be "full, clear and convincing," and sometimes expressed as requiring it to be "clearly established." *Crittenden* v. *Woodruff*,

11 Ark. 82; *Trapnall* v. *Brown,* 19 Ark. 39; *Johnson* v. *Richardson,* 44 Ark. 365; *Richardson* v. *Taylor,* 45 Ark. 472; *Robinson* v. *Robinson,* 45 Ark. 481; *Crow* v. *Watkins,* 48 Ark. 169, 2 S. W. 659; *Camden* v. *Bennett,* 64 Ark. 155, 41 S. W. 854; *Tillar* v. *Henry,* 75 Ark. 446, 88 S. W. 573; 1 Perry on Trusts, § 137; *Broderick & Calvert* v. *Flannigan,* 176 Ark. 1203, 6 S. W. 2d 8; *Spencer* v. *Johnson,* 178 Ark. 1200, 13 S. W. 2d 585.

In *Tillar* v. *Henry,* supra, we said:

"Titles to real estate cannot be overturned by a bare preponderance of oral testimony seeking to establish a trust in opposition to written instruments. The conservatism of the courts has prevented the tenure of realty being based on such shifting sands."

And again in *Nelson* v. *Wood,* 199 Ark. 1019, 137 S. W. 2d 929, we said:

"The general rule, as well as the established rule in this state, seems to be well settled that in order for one to establish by parol either a resulting or constructive trust, the evidence must be 'full, clear and convincing,' 'full, clear and conclusive,' 'of so positive a character as to leave no doubt of the fact,' and 'of such clearness and certainty of purpose as to leave no well founded doubt upon the subject.' These requirements run through a long line of cases from this court."

This same rule was more recently applied in the case of *Darsow* v. *Landreth,* 236 Ark. 189, 365 S. W. 2d 136. So, measuring the evidence in the case at bar by the above rules of law, we now consider the evidence in this case.

The real property involved consists of five separate tracts purchased from different individuals. Deeds to three of the tracts are in the record and the deeds to two of the tracts are not in the record. The record consists of five volumes totaling 1,189 pages. Much of the evidence is directed to the admitted partnership assets

consisting of personal property, and the evidence directed toward impressing a trust on the real property falls short of being so clear, convincing and satisfactory that we would be justified in overruling the decree of the chancellor, who saw and heard the witnesses as they testified.

The undisputed evidence is clear that George and J. B. Wilson were near the same age, and had held themselves out as business partners all of their adult lives. After their father died intestate when they were quite young, they continued to operate an oil business left to them by their father. When George married, he brought his wife to the family home and J. B. continued to live with George and his wife until he also married. After losing the oil business and their home, through mortgage foreclosure during the depression years, George and J. B. remained closely associated with each other and got into the business of farming and raising livestock under the partnership title "Wilson Brothers," and this relationship continued until George's death on July 1, 1967.

All of the deeds of conveyance to the lands here involved were made to George Wilson and to his heirs and assigns forever, and the record is completely void of any competent evidence as to why this was done. It would be next to impossible, and of little value, to analyze the separate testimony of the many witnesses who testified, but the record is clear that most everyone considered the Wilson brothers as a partnership; and most everyone assumed that the partnership included the joint ownership of the land. A number of witnesses called by J. B. testified that George always referred to "us," "our," "Jay and I," and "mine and Jay's," when discussing the farm and its operation. In the sale of some of the land with conveyance to George, the grantors testified that they made the deal with J. B. One of the grantors testified that he dealt with J. B. and sold the land to the Wilson Brothers. The deed, however, was made to George, his heirs and assigns, and there is no evidence as to why this was done. Several witnesses testified as to business they conducted with the Wilson

Brothers. Those witnesses called by J. B. testified that they dealt directly with J. B. in such matters as clearing land, sinking a well, arranging to rent land, baling hay, purchasing and selling livestock and feed, and in doing dragline work on the farm. Some of these witnesses testified that when they attempted to do business with George, he would delay final decision until he could talk with J. B.

The witnesses who were called by Mrs. George Wilson and the heirs, testified that they transacted all their business with George and that George did business with them without having to consult with J. B. One or two of these witnesses testified that George referred to the land as belonging to him and had stated that he intended it should go to his wife and children at his death. The overall testimony of all the witnesses leaves the preponderance of the circumstantial evidence fairly even on both sides.

The evidence is clear that George Wilson assessed the real property taxes for a number of years in the name of Wilson Brothers. On the income tax returns the profits from the farm were divided equally between George and J. B. Loans from the Production Credit Association were made to George and J. B. jointly until some individual judgments were obtained against them and the procedure was changed, at the insistence of the association. The amounts of the judgments against George were less than those against J. B., so they borrowed money and paid off the judgments against George and the P. C. A. loans thereafter were made to George or in his name. All of this evidence definitely established a partnership relation between George and J. B. in the operation of the farm as the Wilson Brothers farm or ranch.

In spite of the voluminous record in this case, the record is vague or silent as to the two most important aspects of the case. It is vague as to the bank accounts and it is silent as to why the deeds were made to George, his heirs and assigns. J. B. testified that the bank accounts were joint accounts or Wilson Brothers

partnership accounts and that both he and George collected money from the farm operations and deposited all they made into the partnership accounts. He testified that they each drew money from the accounts by check when and as they needed it. J. B.'s primary contention is that the lands were purchased by the Wilson Brothers and paid for out of their joint funds.

Numerous canceled checks were offered in evidence. A number of them dated in the 1950's were signed "Wilson Brothers by J. B." Some were signed "Wilson Brothers by George," some were signed "J. B. & George Wilson," some were signed "George and J. B. Wilson by George," and some were signed "George and J. B. Wilson by J. B." Some of the checks were signed "George Wilson by J. B.," but most of the checks introduced by the appellees were dated in the 1960's and were simply signed "George Wilson." None of the checks indicate how the accounts were actually carried at the banks and no bank officer testified as to how the accounts were actually carried or what arrangements were made between the banks and the Wilsons in connection with the accounts. Richard Trice testified that he worked in the First National Bank in Stuttgart back in the '20's and had known the Wilsons since 1926. He testified that they did business at the bank as "Wilson Brothers" while he worked there. A number of duplicate bank deposit slips were introduced into evidence by the appellees. They were dated from 1957 through 1967; some of them were made out to George Wilson and some were made out to Nancy Wilson. From the documentary exhibits it is impossible to tell whether the bank accounts were joint, or partnership accounts, or whether they were the individual or personal accounts of George or J. B. with checking authority granted to the other. No bank official testified on this point. J. B. also introduced a few deposit slips made out to him.

Mr. J. B. Wilson testified that after it was agreed that the P. C. A. loan would be made in George Wilson's name rather than the partnership, the business was carried on as before. In this connection he was asked the following questions and made the following answers:

"Q. What about the bank accounts, were they still carried as Wilson Brothers?

A. No, sir, we carried the bank account in Nancy Tullos' name.

Q. In what bank?

A. In the First National Bank at DeWitt and finally George put an account up here in this bank, once in the Farmers and Merchants and once in the Peoples, in fact he had an account in Peoples when he passed away.

Q. Did you ever have any in the DeWitt Bank and Trust Company?

A. He could have, yes sir, before that but it was before that time.

Q. Mr. Wilson, did you continue to write checks on that bank account?

A. Yes, sir.

Q. Did you write them yourself and sign them?

A. Yes, sir. I put George Wilson by J. B. Wilson.

Q. And did they go through?

A. Yes, sir.

Q. Now did, was there any other provision made for your cashing checks after that change was made?

A. No, sir, George would just give me a book full of signed checks so anything I needed or that come up I could write one."

Mr. J. B. Wilson testified that he deposited all monies that he made individually, as well as what he

collected from the partnership business, into the partnership account.

> "Q. You mean that you deposited to the credit of Wilson Brothers all the money that you made individually?
>
> A. Either to Wilson Brothers or Nancy Wilson's account or George Wilson's account at the Peoples National Bank because · we carried that account in his name. And I have slips for some of the deposits I made, not every one of them because I didn't keep every deposit slip."

In rebuttal J. B. testified that he wrote some checks on the George Wilson account after George's death, but that the account was not in George Wilson's name. He testified that the account was in Nancy Wilson's name and that he had authority to write checks on it. He testified that the money in the account was not any more George's money than it was his; that one-half of the account belonged to him, and that he deposited money to the account.

> "THE COURT: Why was that account in Nancy Wilson's name?
>
> A. George put it in there back when he lived in DeWitt.
>
> THE COURT: Why?
>
> A. I couldn't tell you that.
>
> THE COURT: Well you were his partner weren't you?
>
> A. Yes, sir, he just said let's carry one account in Nancy's name and I said all right so we can both write checks on it and it was back when her name was Nancy Wilson, she hadn't even married.

THE COURT: Was there any judgment against you or George at that time?

A. There was against me and at one time there were some against George but I think there was some judgments that we have paid up but that could have been the reason that he did that. Then is when he started getting the account in this bank too with just George Wilson on it.

\* \* \*

THE COURT: I understood you to testify those checks were George Wilson by you.

A. I signed his name, that's the way we always signed it, George Wilson by me but it come out of Nancy's account. We didn't put Nancy's name, we put George Wilson by J. B. Wilson, and it come out of her account.

THE COURT: And the bank let you do that?

A. That's what they did. That's how they are signed and they come out of Nancy's account."

Mrs. Lillian Young, an abstractor, testified that about a year, or two years, before George Wilson died, J. B. Wilson came to her office and asked her to prepare a deed for his brother, George Wilson, and his wife, to sign conveying J. B. a one-half interest in the land held in the name of George Wilson. She testified that a few days later J. B. Wilson asked her if she had prepared the deed and she told him that she had not. On this point Mrs. Young testified as follows:

"A. I called Mr. George Wilson and asked him to come to my office and he did and I told him that his brother had told me to prepare a deed from Mr. George Wilson and his wife to Mr. J. B. Wilson, and he said, 'No, you don't prepare that deed.'

Q. Did he say whether or not J. B. Wilson had
   any interest in the property or whether he was
   the owner of it or just tell you not to prepare
   any such deed?

A. He told me not to prepare the deed, that was
   his property and it was to go to his wife and
   girls when he was no longer living."

She testified that she had prepared mortgages and deeds
for the Wilson Brothers but that she always looked to
George Wilson because that was the one with whom she
dealt.

"A. George Wilson paid me. He gave me the
   money.

Q. You can have these trusts but did Wilson
   Brothers pay you for drawing the deeds and
   abstract work?

A. These checks may have been given to me that
   way but I always looked to George Wilson be-
   cause that was the one with whom I dealt."

The probative value of this testimony was diminished to
some extent on cross-examination when Mrs. Young testi-
fied that she addressed her bills for service in care of
J. B. Wilson, and when she identified three checks
signed "Wilson Brothers by J. B. W." and made payable
to her for abstract work and taxes. Mrs. Young explained
that it was always hard for her to get in touch with Mr.
George Wilson as he was always out in the country, but
"as to Mr. J. B. Wilson, I could find him most any
time around on the streets."

The appellant J. B. Wilson's witnesses testified that
George had indicated all along that he and J. B. owned
the land together as partners. J. B. testified that the land
was bought and paid for with partnership funds. The
appellees' witnesses testified that George had indicated
all along that the land belonged to him individually.
The solemn deeds of record sustain the appellees' con-

tention and although there is ample evidence that J. B. was a full partner in the livestock and farming operations, we are left to surmise and conjecture as to why the legal title to the real property rested in George Wilson, his heirs and assigns. George Wilson was in bad health for a considerable period of time before his death, the real property was heavily mortgaged without assistance or objections by J. B. The record only contains circumstantial evidence that perhaps the deeds should have been made to George and J. B. as joint tenants when the property was purchased but this was not done. There is no evidence at all of why the deeds were made to George, his heirs and assigns when the property was purchased, and there is no clear and convincing evidence of why this court should do so now. We find no merit to the appellant's other assignment or errors, so the decree is affirmed.

Affirmed.

BYRD J., concurs.

BROWN and FOGLEMAN, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I am as yet unable to understand how the majority can find evidence to overcome appellant's contention that the real estate involved was partnership property or how the trial court could find that J. B. Wilson and George Wilson constituted a farming partnership which stopped short of ownership of the real estate. The evidence that Wilson Bros. owned the land seems stronger to me than that relied upon to show a farming partnership. I think that a partial explanation lies in failure to apply law relating to partnerships rather than to constructive or resulting trusts. Appellant has never sought to impress either upon the conveyances. He has simply sought to establish a trust under partnership law.

The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business. Ark. Stat. Ann. § 65-107 (4) (Repl. 1966);

*Brandenburg* v. *Brandenburg,* 234 Ark. 1117, 356 S. W. 2d 625; *Zajac* v. *Harris,* 241 Ark. 737, 410 S. W. 2d 593. Clear and convincing evidence is not required to prove a partnership. Its existence need be proved only by a preponderance of the evidence. *Brandenburg* v. *Brandenburg,* supra.

We have held that provisions of the Uniform Partnership Act [Ark. Stat. Ann. § 65-101, et seq. (Repl. 1966)] are applicable to partnerships entered into prior to its passage and which had acquired real estate prior to its adoption. *Zach* v. *Schulman,* 213 Ark. 122, 210 S. W. 2d 124, 2 A. L. R. 2d 1078.

Pertinent provisions other than the one cited hereinabove include the following:

1. Unless the contrary intention appears, property acquired with partnership funds is partnership property. Ark. Stat. Ann. § 65-108 (2) (Repl. 1966).

2. Every partner is an agent of the partnership for the purpose of its business and his acts for apparently carrying on the business of the partnership bind it. Ark. Stat. Ann. § 65-109 (1) Repl. 1966).

3. A partner's interest in partnership property is as a tenant in partnership. Ark. Stat. Ann. § 65-125 (1) (Repl. 1966).

Until adoption of the Uniform Partnership Act in 1941, the title to real property could not be held in the name of the partnership. *Percifull* v. *Platt,* 36 Ark. 456; *Spaulding Mfg. Co.* v. *Godbold,* 92 Ark. 63, 121 S. W 1063, 29 L. R. A. (n.s.) 282, 135 Am. St. Rep. 168, 19 Ann. Cas. 947. The act recognizes, however, that title to partnership real property may be held in the name of one of the partners, but that this partner may not effectively convey title to the property unless the grantee in the conveyance is a holder for value without knowledge or the conveyance is one for apparently carrying on the business of the partnership. Ark. Stat. Ann. § 65-

110 (3) and (4) (Repl. 1966). When the legal title is vested in the name of one of the partners, he becomes, in equity, a trustee for the other partners to the extent of their interest. *Spaulding Mfg. Co.* v. *Godbold,* supra.

Real estate purchased for partnership purposes, paid for with partnership funds and held and used for partnership purposes, is treated as partnership property regardless of how or by what agency it is bought or in whose name the title is held, and the holder of the legal title is a trustee for the partnership. *Cain* v. *Mitchell,* 179 Ark. 556, 17 S. W. 2d 282. When land is purchased for use in carrying on the partnership business with partnership funds and there is no agreement or design that it be held for the partners' separate use, it will be treated in equity as vested in them in their firm capacity, whether the title is in all, or less than all the partners. *Lewis* v. *Buford,* 93 Ark. 57, 124 S. W. 244.

Proceeding upon these well established principles, we should turn aside from attempts to measure the evidence by the clear and convincing yardstick and abandon efforts to decide whether there was a constructive or resulting trust to answer the following pertinent inquiries:

1. Did J. B. Wilson receive a share of the profits of the business of Wilson Bros., consisting of him and George Wilson?

2. Is there any evidence that he received these profits as compensation for services as distinguished from his share as a partner?

3. Does the evidence that a partnership existed preponderate?

4. Were the lands in question purchased with partnership funds?

5. If so, is there a preponderance of the evidence to show an intention that the lands not be held as partnership property?

6. Does the evidence show that the property was used for partnership purposes?

I humbly submit that questions 1, 3, 4, and 6 must be answered in the affirmative and questions 2 and 5 in the negative. This being so, the decree should be reversed for a decree declaring that George Wilson held the lands as trustee for the partnership of Wilson Bros. Time and space limitations do not permit adequate elaboration upon the great volume of evidence in the record. The testimony of J. B. Wilson, even as limited by the trial judge, clearly established a case for relief. But a decree in his favor does not hinge upon J. B.'s credibility. His testimony is corroborated in most instances where documentary evidence is available and by disinterested witnesses who would have no motive for misrepresentation.

The chancellor found, and the majority proceeds upon the assumption, that there was a partnership consisting of J. B. and George Wilson engaged in livestock and farming operations upon the lands involved. In any view of the case we must start upon the well substantiated premise stated in the majority opinion that these two brothers had held themselves out all their adult lives, and were universally regarded, as partners d/b/a "Wilson Bros."

J. B. was 21 months older than his brother. They first operated a petroleum business left them by their father. J. B. told of their acquisition of the various tracts making up the farm near 3-Way Store known as Wilson Bros. ranch. The acquisitions commenced about 1940 and extended into the early 1950's. One of the tracts purchased was the Lane tract, on which a Federal Land Bank mortgage was assumed. Payments were made through a National Farm Loan Association. Wilson's testimony about payments by him to this association was corroborated by the secretary of that association, who said that the loan was assumed by George and J. B., but carried in the name of George. He recalled that a payment was made by J. B. in cash, and

a receipt issued to him on May 29, 1947. This witness also identified a 1945 receipt for a payment by Wilson Bros. J. B. said he borrowed money from Prislovsky to pay off this debt and later borrowed from Prudential Life Ins. Co. to pay. He produced a check to Prislovsky from Wilson Bros. which he said was for interest on this loan. J. B. also said that he borrowed money from Dr. J. B. Strait to pay for the Keaton land. He produced two Wilson Bros. checks signed by him for payments on this loan. He said that Wilson Bros. then obtained a loan from Prudential Ins. Co. to pay off the debts to Prislovsky and Strait. While these mortgages were signed by George and his wife only, J. B.'s testimony that this insurance company required that J. B. sign the note is corroborated by a letter from the company and does not seem to be questioned.

J. B. says that a loan made by John Hancock Life Insurance Company was obtained to pay the Prudential indebtedness, to pay Wortman for land clearing and to pay other debts. He was not asked to sign either the mortgage or the note. He admitted that money was borrowed by George on more than one occasion from Mrs. Kennedy, but stated that he went and got the money on one occasion and that all the proceeds of these loans were placed in a bank account in the name of Nancy Tullos, one of George's daughters, and that he and George wrote the checks on this account for partnership purposes. After PCA loans were obtained in George's name rather than in the name of Wilson Bros., the proceeds, according to J. B., were deposited in the bank, either in the name of Nancy Tullos or George Wilson. He said that he then signed checks "George Wilson, by J. B. Wilson." He also said that George would give him a book of signed checks, and exhibited eight that he had when George died. He exhibited some deposit slips for deposits made by him to this bank account.

J. B. also exhibited checks for payment of taxes on the farm, which he said came from partnership funds. Two of them were signed J. B. and George Wilson, and two were signed Wilson Bros. by J. B. Wilson. Tax assessment records clearly show that the lands were as-

sessed in the name of Wilson Bros. for many years prior to George's death. Not one of these tracts was assessed in the name of George Wilson, although a lot owned by him was so assessed. The tax assessor testified that the assessments for the years 1963 through 1967 were made by George Wilson. After his death the assessment was changed to show the name of the owner as Kathryn Wilson at the suggestion of her attorney. In 1960 only is there any indication that George Wilson paid these taxes. J. B. exhibited other checks written on Wilson Bros. for lands purchased. One of them was for the Cox land in 1952, later sold. He also exhibited a check to Harry Harper signed Wilson Bros. by J. B. Wilson, which he testified was to retire a loan which enabled them to construct a building at the 3-Way Store. He exhibited a deposit slip to the account of Wilson Bros. identifying a check of H. W. Harper, which he said represented the loan proceeds. Many other such Wilson Bros. checks were exhibited.

J. B. testified that neither he nor George ever performed any work in any capacity for anyone other than Wilson Bros. This testimony is not substantially contradicted. He stated that they never had an accounting but used money from the business as they needed it. Although there is abundant evidence of use of parts of the lands by J. B. Wilson, there is never any indication that he paid any rent or that he was expected to pay any. The only business telephone listing was in the name of Wilson Bros. Ranch.

J. B. testified that the first land purchase made by either was in 1937. The land was deeded by Kentucky Home Life Insurance Company to J. B. Wilson. J. B. said that it belonged to him and George and that they sold it for $6,000 and put the money in the Wilson Bros. bank account. J. B. is corroborated about many of the land purchases. Floyd McPherson said that negotiations for purchase of 192 acres from him in 1946 were opened and the deal made by J. B. Wilson. $1,000 of the $5,000 purchase price was paid in cash by J. B., $500 was credited for a bull traded by J. B. and $3,500 was paid by Roy McCollum. McPherson said that the

contract to sell was to Wilson Bros., and his recollection was that the deed was made to Wilson Bros. Esker Mc-Pherson said that J. B. approached him and wanted him to buy some land and hold it for J. B. Later J. B. and George returned and said that Roy McCollum would finance them to buy a one-third interest in the Montgomery estate. After the purchase, they brought a deed to McCollum for McPherson to sign.

The Lane property was bought from Mrs. Paul Gourley. Her letter offering the land to George and J. B. in April 1944 was exhibited. The offer was accepted by a letter over George's signature. It recited that the terms were acceptable to "J. B. and myself" and that "we" are accepting them. It also recited that "we" will pay for it.

Strong corroboration of J. B. Wilson came from Warren Bass, a certified public accountant, called as a witness by appellees. He prepared income tax returns for George Wilson for several years. He did not consider that a partnership existed, and did not prepare a partnership return. At George's request, he prepared returns showing all income shared with J. B., "because he needed to help his brother anyway." All the income and expenses from the farming operations and cattle operations were consolidated, then divided in halves with one-half allocated to each brother. Bass said George told him that he was giving his brother one-half. George Wilson did tell him that the cattle and personal property belonged to the two and that all the income was paid to them as Wilson Bros. When Bass prepared the portion of the return for George relating to social security self-employment tax, he listed George Wilson's farm income as coming from "farm partnerships." A breakdown of the income and expenses on the worksheets for these returns revealed that in 1966 George Wilson received $132.32 in interest from a bank as his only income from any source other than the partnership. Expenses for acquiring cotton acreage bought are included. Taxes in the amount of $793.23 were included as was interest amounting to $5,007.78. George Wilson claimed no separate income from the land, and no

rental charge was made to Wilson Bros. or to J. B. Wilson.

Arthur Thomas bought the Madden place from them. He dealt with George, but said that George told him that the land was owned by Wilson Bros. Judge Fred Wilcox bought land from them, which was part of the Cox place. At closing, Judge Wilcox asked if J. B. and his wife shouldn't sign the deed. He was assured by George and an abstractor that the title was in George. Wilcox said that Wilson Bros. had paid him by check for work done on the farm.

Various witnesses testified about land clearing for Wilson Bros. on their farm near 3-Way Store. They testified about having dealt with both George and J. B. with reference to the clearing, and some of them recite payments made by Wilson Bros. checks or checks signed by J. B. and George Wilson. Some of the payments were made by cash, and some by farm machinery apparently owned by Wilson Bros. One of these witnesses, William Wortman, admitted receiving four checks for clearing land signed by George Wilson only and payable to him as administrator of his father's estate. This was in 1965 when J. B. Wilson says that the bank account was carried in George's name, well after the change in the PCA loans.

Mrs. Lillian Young said that she had closed loans for Wilson Bros. and prepared deeds for them. Although she first stated that she always dealt with George, her statement for abstract work in 1953 was rendered to Wilson Bros. and addressed to them in care of J. B. She received at least three checks for work done for Wilson Bros. on the account of Wilson Bros. signed by J. B. W. She explained that it was hard for her to contact George, but she could always find J. B. The abstract work was done on land, and she was told to send her statements to Wilson Bros.

Marion McDonald leased the Montgomery and Keaton lands from Wilson Bros. in 1947 and 1948. He dealt with J. B. principally, although he did talk to

George. The contract required him to put down a new well which would become the property of Wilson Bros. at the end of three years. He grew rice crops on the land. The landowner's share of the crop proceeds was paid to Wilson Bros. McDonald sold the pump and power unit on the well to Wilson Bros. at the end of the three-year term for 16 head of cattle and $800. Later McDonald installed a new pump when J. B. told him something was wrong. He billed J. B., who paid him. George Wilson always referred to the lands as belonging to Wilson Bros. in discussions with McDonald.

Albert Higgins and William J. Brown told about negotiations with George Wilson for renting lands and for proposed fish farming operations. Both said George Wilson stated that the land belonged to him and J. B.

Wilson Bros. paid one-half of the bills for fertilizing and putting chemicals on crops of tenants on the land. There is evidence that payments for the landlord's share from cotton and cottonseed sold at the gin were made to Wilson Bros. It was Howard Ives' recollection that both J. B. and George signed the lease when he rented the farm for two years. It was shown that the PCA in Stuttgart financed the operations of Wilson Bros. beginning in 1954. The first loan application was signed by both J. B. and George. It was for acreage in rice, beans, oats and lespedeza. The ownership of one of the tracts of land on which the crops were to be produced was shown to be in J. B. and George Wilson. The 1955 application was for crop production on lands farmed in cotton, milo, oats, rye grass pasture and pasture crops. One of the tracts was again shown under the ownership of J. B. and George Wilson. The change in the name to whom the loan was granted was made in 1962 because of judgments against J. B., but George kept on mortgaging the same property as security.

The PCA held an insurance policy issued by American Livestock and Insurance Company, dated July 22, 1967, insuring J. B. and George Wilson, d/b/a Wilson Bros. The indebtedness existing at the time of George Wilson's death was paid by credit life insurance, apparently from this policy. The policy was offered by

PCA but not required. Premiums were charged to the borrower. The brothers had carried credit life as early as 1955. The policy could not have been issued on J. B. when the loan was made to George only, according to the PCA officials.

George Wilson's son-in-law said that a check he gave in payment for cattle bought from George was made to Wilson Bros., and delivered to George, who endorsed it and used it to pay off a PCA loan. He said that he got free rent on his bean crop by working on the farm for George and J. B. He testified that he helped them put in the cotton crop, and they let him put in another bean crop the next year. He later professed that his reference to J. B. in this testimony was an oversight on his part.

One of the appellees, Joan Rodgers, a daughter of George, testified that she would say offhand that her father engaged in no business other than the farm and 3-Way Grocery and the cattle business. George's widow testified about income from sale of Christmas cards and a flower shop and from her own employment. She definitely stated that her earnings were applied to the needs of her children, herself, her home and the payment of bills such as doctor's bills, all of which were beneficial to her husband. The only suggestion that George Wilson had separate assets to apply to the purchase of lands is in her testimony that a lot given her by her mother was mortgaged to Mrs. Kennedy for a payment on the farm. She said that "we" later paid the mortgage and sold the lot. The proceeds of the sale of the lot were used for the George Wilson family. She testified that her husband became a veterinarian and worked for others with cattle before he and his brother acquired their herd. This is the only way in which she fixes the time, and is the only indication that George Wilson ever engaged in any business activity or employment separately from J. B. Wilson.

There is other testimony and other corroboration of J. B. Wilson. That recited is illustrative. I submit that the evidence is more than sufficient to establish J. B. Wilson's interest in the lands known as the Wilson

Bros. Ranch held in the name of George Wilson. This is without the testimony of J. B. Wilson excluded by the court under the dead man's statute. This may have been error. The personal representative of George Wilson's estate was a party to J. B.'s counterclaim or cross-complaint only as a volunteer. It is not seriously contended that the land is needed for any purpose in connection with the administration of the estate. Wilson concedes that he is estopped to assert any claim against creditors of the George Wilson estate because of the long number of years that he permitted the title to be held in George's name. He admits that the partnership is liable for the payment of mortgage indebtedness on the land. Even if the administrator is properly a nominal party, the dead man's statute has no application to litigation which is basically between J. B. Wilson and the heirs of the estate.

This is also without regard to appellant's serious contention that the answer to J. B. Wilson's counterclaim or cross-complaint should have been stricken, because it was filed more than 20 days after service of the counterclaim. See *Utley* v. *Heckinger,* 235 Ark. 780, 362 S. W. 2d 13.

I respectfully dissent.

I am authorized to state that Mr. Justice Brown joins in this opinion.

Opinion on rehearing delivered   June 21, 1971

PER CURIAM

On petition for rehearing appellant asks us to consider the following, among other things:

1. Appellees commenced this action in the trial court claiming ownership of five tracts of land, alleging that all tracts were conveyed to George Wilson, but introduced deeds conveying only three of the tracts and rested without producing any other evidence. Appellant contends that appellees' proof failed as to the other two tracts. He further relies on possession of these tracts by J. B. Wilson and uncontradicted testimony by the grantor, who conveyed one of these tracts, that the deed was made to Wilson Brothers.

2. There is uncontradicted evidence that partnership funds were used to pay at least a part of the purchase price of all the lands involved.

3. There is no evidence to show that any of the tracts of land involved was paid for with any money except that belonging to a partnership of Wilson Brothers.

4. Evidence tending to show that deposits were made in bank accounts in the name of Wilson Brothers and checks were drawn on the account of Wilson Brothers was undisputed, and evidence that proceeds of operations conducted by J. B. Wilson were deposited to bank accounts of Wilson Brothers or to accounts in the name of George Wilson and, perhaps, in the name of his daughter, was not contradicted.

5. Evidence supporting appellant's contention includes applications for crop production loans by George Wilson in which the land ownership was stated to be by Wilson Brothers, and tax assessments of the lands by George Wilson in the name of Wilson Brothers.

Upon original submission, the court was sharply divided upon the question whether a preponderance of the evidence supported the chancellor's finding that J. B. Wilson had no interest in the lands involved. The chancellor properly found that all farming operations were by a partnership consisting of J. B. and George Wilson.

The majority then sustained the chancellor's finding but found these deficiencies in the evidence:

1.  Deeds to only three of the five tracts involved were ever introduced in evidence, all of which named George Wilson as grantee. The identity of the grantor in the other two deeds was never disclosed. In spite of the fact that there was some evidence that some payments on the purchase price of some of the lands and some evidence that the grantors were dealing, or thought that they were dealing with Wilson Brothers, or J. B. and George Wilson, the record was silent as to the reason the title to the land was taken in George Wilson.

2.  The overall testimony of all the witnesses left the circumstantial evidence as to the ownership so evenly balanced that it could not be said that a preponderance lay either way.

3.  The evidence as to the names in which the bank accounts were carried, the source of the funds deposited, the identity of those authorized to draw checks on the account, the arrangements between the depositor or depositors and the banks was vague. No explanation was made or offered as to the failure of either party to produce bank records or bank statements or the testimony of bank officers or employees, other than one whose testimony related to transactions which took place many years ago. It was not possible to determine, with any degree of certainty, whether the pertinent bank accounts were joint accounts, partnership accounts or individual accounts of one or the other of the brothers, with checking authority to the other.

The affirmance of the chancellor's decree as to the ownership of the lands was based upon the want of evidence as to the reason the deeds introduced were made to George Wilson. We have considered this case, both on original submission and on petition for rehearing over a longer period of time than we usually devote to a single case, and are still divided and uncertain as to the

correct result, because of the deficiencies in the evidence pointed out. We are not able to say with any degree of certainty which party is to blame for not producing evidence covering these deficiencies. This determination does not rest solely upon placing the burden of proof in the case, because the evidence may be readily available to one party and not available to the other at all.

The general rule in equity cases is that, with all the record fully developed, we should finally decide the case here instead of remanding it to the chancery court for a new trial. *Narisi* v. *Narisi,* 233 Ark. 525, 345 S. W. 2d 620. The general rule we follow in this respect is proper and should be observed in all save the most exceptional cases. Yet there are exceptions. This court has the power, in furtherance of justice, to remand any case in equity for further proceedings. *Carmack* v. *Lovett,* 44 Ark. 180. We have done this when the chancery court had based its decision on an erroneous theory. *Long* v. *Charles T. Abeles & Co.,* 77 Ark. 156, 93 S. W. 67. We also did so when we found that the chancery court had erroneously decided a case upon an issue of law, leaving issues of fact undecided. *Fordyce* v. *Vickers,* 99 Ark. 500, 138 S. W. 1010.         .

When we can plainly see what the rights and equities of the parties are, we will not remand a chancery cause. *Pickett* v. *Ferguson,* 45 Ark. 177, 55 Am. St. R. 545. On the other hand, when it is clear that the cause was tried in the chancery court upon an erroneous theory, and we are unable to determine from the evidence before us the decree that should have been rendered, we will, in furtherance of justice, remand the cause to be reopened, to permit further proof so the case may be determined upon the proper principles. *Long* v. *Charles T. Abeles,* supra (on rehearing). In *Fordyce* v. *Vickers,* supra, we said:

But where the chancellor has decided a case upon an issue involving virtually a question of law, in which we find that he was in error, and leaves undecided other issues in the case involving questions of fact, which he is probably better able to pass upon by

reason of his greater familiarity with the circumstances and conditions surrounding said issues, this court in its discretion may remand the case for his decision upon said issues of fact. Under the circumstances of this case, we deem it wise to remand the cause for a determination by the chancellor of the matters relative to the improvements, taxes, and rents.

In *Gaither* v. *Gage*, 82 Ark. 51, 100 S. W. 80, we remanded a case for further proceedings where it was apparent that the case was tried upon an erroneous theory in the chancery court.

We analyzed previous holdings in *Wilborn* v. *Elston*, 209 Ark. 670, 191 S. W. 2d 961, saying:

We try chancery cases de novo, and the usual practice on appeal is to end the controversy here by final judgment, or by direction to the trial court to enter a final decree. There are, however, exceptions to this practice, and it rests in the discretion of this court to determine whether, upon reversal of a cause, the same should be opened for a new trial. If the cause is heard and determined by the chancellor on an erroneous theory, or if it is not sufficiently developed in the trial court, this court may remand for further hearing on the whole case, or on certain issues. [Citing cases.] This practice was followed in the instant case on the former appeal, where the cause was heard by the chancellor on what we determined to be an erroneous theory, and the testimony on what we conceived to be the pertinent issues did not appear to us to have been fully developed.

Even when all the parties tried a case upon an erroneous theory and the chancery court decided the case upon that theory, we have exercised our discretion to remand such a case so that pertinent facts, not fully developed, might be ascertained. *Brizzolara* v. *Powell*, 214 Ark. 870, 218 S. W. 2d 728.

In *Carlile* v. *Corrigan,* 83 Ark. 136, 103 S. W. 620, on reconsideration, we found the question, whether a preponderance of the evidence sustained a conclusion reached in the original opinion finding error but granting judgment here, not free from doubt, and, since it appeared that the evidence on that point had not been fully developed, we remanded to permit further testimony.

When the appellee tried a case upon the theory that a partnership was at will and the court accepted that theory, but we found that the partnership was one for a period of at least three years unless dissolved for sufficient cause, we gave leave to the parties to take further testimony on the existence of cause for dissolution. *Tankersley* v. *Norton,* 142 Ark. 339, 218 S. W. 660.

In our latest exercise of this discretion, we remanded a case in which we affirmed the chancellor as to the termination of a trust in order to permit the trustees to render an accounting to determine whether they were to be reimbursed for a financial loss. *Arnett* v. *Lillard,* 247 Ark. 931, 448 S. W. 2d 626. There we said:

> We agree with the chancellor that the trust may be terminated as of the date appellee pays the government mortgage. However, appellants should be afforded the opportunity to present a fair accounting of their tenure under the trust and they should be reimbursed in the event they have to that date suffered an unavoidable loss. No such contention was made at the trial level and a loss in actuality may not exist; however, it would be putting form above equity to permit an early and unexpected prepayment to burden appellants with a financial loss and to the benefit of appellee. We are clothed with discretion to order a case reopened in exceptional circumstances for additional proof if that is necessary to achieve equity. See *Brizzolara* v. *Powell,* 214 Ark. 870, 218 S. W. 2d 728 (1949).

Appellant filed an answer to appellee's original complaint, in which he alleged that he was not wrong-

fully interfering with appellee's use and control of the land involved here, because it was a partnership asset of which he was properly in control and in which he had a partnership interest. He filed a cross-complaint against the appellee widow and heirs in which he alleged that all assets and property held in the name of George Wilson, with minor exceptions, were owned by a partnership consisting of George Wilson and J. B. Wilson, that the legal title was held by George Wilson in trust for the partnership and the partners, that land held in the name of George Wilson was purchased with partnership money, and that the farms involved were operated by the partnership. He further alleged that any attempt to base title to any such lands held in the name of George Wilson would constitute a fraud, actual or constructive, which should impress a trust upon the property in his favor. He asked that title to a one-half interest be vested in him, subject to mortgages and to claims of creditors against the estate of George Wilson.

A reading of the chancellor's opinion discloses that the question of title to the real estate must have ultimately been treated as if the determination of the case turned upon the existence of a trust ex maleficio or resulting trust. Every authority cited in this opinion has to do with an alleged trust, either constructive or resulting. None relates to the situation where partnership funds were used in paying the purchase price. At first blush one of them, *Randolph* v. *Randolph*, 216 Ark. 193, 224 S. W. 2d 809, might appear to be such a case, but it is not. The only reference to partnership is the contention of one brother, who joined with other siblings in the conveyance of land to another brother, that there was an agreement between him and the grantee to form a partnership for the purpose of acquiring title to the land from their cotenants and to pay for it from the proceeds of timber to be sold off the land. Even so, he did not contend that title was to be held by the partnership. He contended that the grantee agreed to convey an undivided one-half interest in the land to him. The question involved there had to do with the existence of an enforceable oral contract to convey or of a resulting trust. There was no evidence of the use of any

partnership funds or of the existence of any partnership assets.

We certainly agree that neither a constructive nor resulting trust was established by the evidence. Inasmuch as the authorities upon which the chancellor rested his finding were based upon this decision, we cannot be certain that there was a clear-cut decision on the partnership theory.

In *Harbour* v. *Harbour,* 207 Ark. 551, 181 S. W. 2d 805, where a resulting trust was alleged, the chancery court rendered a decree in favor of a wife on the basis that the lands deeded to the husband were paid for from a joint bank account. This court found the decree on that theory erroneous, but sustained the wife's contention that she had an equitable interest by reason of a resulting trust, and remanded the case to permit the wife to show the exact amount of her funds which were used in the purchase of the land.

A case quite similar to this is *Kook* v. *American Sur. Co. of New York,* 88 N. J. Super. 43, 210 A. 2d 633, 18 A. L. R. 3d 784 (1965). There in a suit on an insurance policy, the court found that there was coverage under the policy if property held in the names of the plaintiffs was the property of a partnership consisting of the plaintiffs. The court remanded the case for the taking of further proof on the subject. That court was not satisfied with the existing proof on the subject because the terms of neither the partnership agreement nor real estate purchase agreement were disclosed. No books, records, settlements, documents, income tax returns or other evidence corroborative of an interested partner was introduced. Because the court entertained substantial doubt as to whether the partnership issues were adequately understood or canvassed at the trial level, the court, in the interest of justice, remanded the case for additional proof. Obviously, there was more proof to support appellant's partnership theory in this case than there was in that.

Because of our uncertainity as to the preponderance

of the evidence, as to the theory upon which the case was decided, as to the rights and equities of the parties under the evidence before us, which seems not to have been fully developed, and in the furtherance of justice, we feel that this case should be remanded to the chancery court. There the parties shall be permitted to offer further evidence to show:

1. How the record title to the lands was held, and the identity of the grantee in any unrecorded deeds conveying the property.

2. The reasons for taking the title in the names of the grantees of all conveyances of lands alleged to be partnership property, rather than in the names of the two alleged partners.

3. The names in which bank accounts were held, the source of funds deposited thereto, the person authorized to draw checks on each such account, the arrangements between the depositors and the banks, and the disposition of the funds deposited.

4. The source of the funds used to pay the purchase price of any of the lands in which the grantee in the deeds when purchased was George Wilson.

5. Any accountings between the partners and withdrawal of partnership funds by the individual partners for their own account.